UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CARLOS SAVINON,                                      :

                                                     :

                         Petitioner,                 :          04 Civ. 1589 (RMB) (GWG)

                                                     :

        -v.-
                                                     :          REPORT AND
                                                                RECOMMENDATION
                                                     :

WILLIAM MAZUCCA, Superintendent,
Fishkill Correctional Facility, et al.               :

                         Respondents.                :
--------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Carlos Savinon, currently an inmate at the Otisville Correctional Facility, brings this

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Following a jury trial in the

New York State Supreme Court, New York County, Savinon was convicted of one count of Rape

in the First Degree (N.Y. Penal Law ("N.Y.P.L.") § 130.35) and one count of Sexual Abuse in

the First Degree (N.Y.P.L. § 130.65).  Savinon was sentenced to concurrent, determinate terms of

nine years on the rape count and five years on the sexual abuse count.  For the reasons stated

below, Savinon's petition should be denied.

I.  BACKGROUND

        On November 14, 2000, Savinon's first trial ended in a mistrial after defense counsel

mentioned in his opening statement that the complainant had had three abortions.  (See I Tr. 27-

28, 38).[1]  The new trial commenced the same day.

---

        [1]The state court transcript in this matter has been filed in four volumes.  See State Court
Transcript, filed July 30, 2004 (Docket #9).  "I Tr." refers to volume one.  "II Tr." refers to
volume two.  "Tr." refers to volumes three and four, which are consecutively paginated.  "S."

A. <u>The Evidence Presented at Trial</u>

1. <u>The People's Case</u>

In the spring of 1997, Savinon met the complaining witness, Sandra Jiminian, at the home of one of Jiminian's friends, Adamilka Benitez do lo Santos ("Benitez"). (<u>See</u> Jiminian: Tr. 68-69). Jiminian testified that she entered the United States illegally from Santo Domingo at the end of 1989 or in 1990 when she was approximately 18 years old. (<u>See</u> Jiminian: Tr. 66, 192).

After being introduced, Savinon and Jiminian "started talking like friends," and he said he would call her the following day. (Jiminian: Tr. 69). Thereafter, Savinon called Jiminian and they would talk. (Jiminian: Tr. 70). Approximately one month later, Savinon and Jiminian went out to dinner. (Jiminian: Tr. 70). Following dinner, Jiminian and Savinon went to a hotel in New Jersey. (Jiminian: Tr. 72). Although Jiminian and Savinon did not have sex that night, they did have sex the following morning. (<u>See</u> Jiminian: Tr. 72-73). At that time, Jiminian did not know Savinon's last name or his address. (Jiminian: Tr. 73). Jiminian did have Savinon's beeper number, and she knew that he worked selling international phone calls. (Jiminian: Tr. 73-74).

Following the night at the hotel, Jiminian and Savinon would "go out" periodically. (Jiminian: Tr. 75). They had an "open" relationship where they met every few weeks or so after he would beep her. (Jiminian: Tr. 75, 213). Jiminian and Savinon had sex each time they saw each other, either in a hotel, in her apartment, or in a car. (<u>See</u> Jiminian: Tr. 76, 216, 218). Although Savinon used a condom the first time they had sex, he did not use one thereafter. (<u>See</u> Jiminian: Tr. 217). During this period, Savinon gave Jiminian a television and some money on a

_____

refers to the sentencing transcript, which is annexed to volume four.

few occasions.  (See Jiminian: Tr. 76-78).  Jiminian testified that, prior to December 1998, there were never any problems in their relationship.  (See Jiminian: Tr. 80).

On December 4, 1998, Jiminian was at home after a day at work cleaning houses. (Jiminian: Tr. 81-83).[2]  At approximately 11:00 p.m., Savinon arrived in a Lexus and honked the horn.  (Jiminian: Tr. 81-82).  Luis Camacho, who is also called "Flaco," was driving the car. (Jiminian: Tr. 82).  Jiminian had seen Flaco drive Savinon's car "many times."  (Jiminian: Tr. 80).  Although it appeared that Savinon and Flaco were friends, Jiminian had only seen Flaco "like four or five times" and came to know him through Savinon.  (Jiminian: Tr. 79-80). Jiminian testified that she and Flaco were "Hi, how are you" acquaintances, (see Jiminian: Tr. 79), and that she did not know his real name.  (Jiminian: Tr. 80).  Jiminian put on her shoes and went downstairs to greet Savinon.  (Jiminian: Tr. 92).  Once Jiminian came over to the car, Savinon asked Jiminian if she wanted to go out, and told her that she should wear "something sexy."  (Jiminian: Tr. 92, 94).  Jiminian then changed into a pair of gray pants, a strapless blouse, and boots.  (Jiminian: Tr. 94).

Jiminian, Flaco, and Savinon went to a place in Yonkers called Jomas Bar ("Jomas"). (Jiminian: Tr. 95).  They arrived at Jomas at approximately 12:30 a.m. and were seated at a table. (See Jiminian: Tr. 129).  Savinon pressed Jiminian to drink alcohol, and a glass of whiskey was placed in front of her, but she did not drink from it because she did not drink alcohol.  (Jiminian: Tr. 130).  Although they had never done so before, on "three or four" occasions that night

---

[2]At this point in her testimony, Jiminian described her arrest on narcotics and gun charges and her conviction on a charge of criminal possession of drug paraphernalia.  (See Jiminian: Tr. 83-86, 90, 180).

Savinon gave Jiminian sips of alcohol from his mouth. (Jiminian: Tr. 131-32).[3] This occurred over a span of approximately 25 minutes. (Jiminian: Tr. 132). The alcohol was "very strong" and Jiminian would have a sip of club soda "very quickly" after Savinon would give her a drink. (Jiminian: Tr. 131-32).

Savinon told Jiminian that she was going to dance in a competition being held at Jomas, and attempted to enter her in the contest, but she refused. (Jiminian: Tr. 132-33; accord Jiminian: Tr. 232). Savinon did not seem to have a problem with Jiminian's refusal to enter the competition and she thought the whole discussion was a joke. (Jiminian: Tr. 133-34).

At some point, Savinon left the table for approximately one hour. (Jiminian: Tr. 134). Jiminian was seated at the table with Flaco and she noticed Savinon "at the bar . . . talking to a girl." (Jiminian: Tr. 135). Savinon and the girl, whom Jiminian did not know, were talking, drinking, and dancing at the bar for approximately 20 minutes. (Jiminian: Tr. 135). Jiminian saw this as being "fine" and it did not "do anything" to her. (Jiminian: Tr. 135). She also felt "ashamed," however, because she did not know where Flaco had gone and she was "alone at the table." (See Jiminian: Tr. 136, 234). When Flaco returned to the table, she told him that she did not "'feel very good'" and that she wanted to leave. (Jiminian: Tr. 136). Flaco said that they should wait for Savinon to return before leaving. (Jiminian: Tr. 137). Flaco told Jiminian that Savinon had the keys to the car. (Jiminian: Tr. 137). Jiminian went to Savinon, who was at the bar talking with the same girl, and told him that she wanted to leave. (Jiminian: Tr. 137-38).

---

[3]Jiminian testified that she did not make a "big deal" of Savinon feeding her food from his mouth and that she did not ask him to give her liquor from his mouth. (Jiminian: Tr. 221). She also testified that she did not make overt displays of affection towards Savinon. (Jiminian: Tr. 221).

Savinon told Jiminian that she was "'with'" him, "grabbed" her by the arm, took her to the table and left her there with Flaco. (Jiminian: Tr. 138). Approximately 15 minutes later, Flaco noticed that Jiminian was not feeling well. (Jiminian: Tr. 138-39). Flaco told Jiminian that he did in fact have the keys, and so they went to the car to wait for Savinon. (Jiminian: Tr. 139-40).

Approximately 20 minutes later, Savinon exited the club. (Jiminian: Tr. 140-41). Jiminian was seated in the front passenger seat of the car and Flaco was in the driver's seat. (Jiminian: Tr. 140). Savinon got in the back seat of the car and told Flaco, "[L]et's go." (Jiminian: Tr. 141). As they were driving to the highway, Savinon asked Flaco, "'And what's going on with Sandra? What kind of problem is she having?'" (Jiminian: Tr. 141). Savinon then started talking to Jiminian and was touching her breasts over her blouse. (Jiminian: Tr. 141-43). Jiminian removed his hand on "four or five" occasions, telling him "not to touch [her]" and "to remove his hands." (Jiminian: Tr. 142). Savinon said to Jiminian, "Oh, you want to fight," and she told him that she wanted to be left alone. (Jiminian: Tr. 142) (internal quotation mark omitted). Savinon "removed" Jiminian's seat belt and continued touching her breasts, but she told him to leave her alone and that they were "'going to have an accident'" because "'Flaco [was] driving.'" (Jiminian: Tr. 143). Savinon then "grabbed" Jiminian and "put [her] in the back" of the car. (Jiminian: Tr. 144). Savinon began touching her breasts over her clothing and kissing her on the mouth and neck. (Jiminian: Tr. 144-45). Savinon then laid Jiminian down in the back seat and they "were sort of wrestling" because Jiminian "didn't want him to touch [her]." (Jiminian: Tr. 145). Jiminian was taking her coat off and "helping to remove it" because she was "uncomfortable." (Jiminian: Tr. 238). Savinon continued touching and kissing her. (Jiminian: Tr. 145). Savinon said to Jiminian, "'Oh, so you want to fight? Fight.'" (Jiminian:

Tr. 145).  Savinon began hitting Jiminian in the face with an open hand.  (Jiminian: Tr. 145).  He

was hitting Jiminian "hard" and she "started to cry."  (Jiminian: Tr. 145).  She told him not to hit

her in the face because she had not "been disrespectful to him that way."  (Jiminian: Tr. 145).

Savinon, however, continued kissing her and lowered her blouse and bra.  (Jiminian: Tr. 145-46).

Jiminian "was completely laying down on the back seat" and Savinon was "on top" of her.

(Jiminian: Tr. 146).  Jiminian was crying and "grabbing" Savinon's hand so he would stop

hitting her in the face.  (Jiminian: Tr. 146).  Flaco continued driving and did not do anything

during this time.  (Jiminian: Tr. 146).  Savinon pulled out his penis and said, "'Look, hey, Flaco,

what she's going to do to me.'"  (Jiminian: Tr. 148).  Jiminian told Savinon that she did not

"'want to do this.'"  (Jiminian: Tr. 148).  Savinon put his penis in Jiminian's mouth, (Jiminian:

Tr. 148), and told her that he "'want[ed] to stick it in [her].'"  (Jiminian: Tr. 148).  Savinon

started to unbutton Jiminian's pants, breaking the zipper and tearing them in the process.

(Jiminian: Tr. 150-51).  Savinon announced that he was "'going to stick it to'" Jiminian "'in

front of El Flaco.'"  (Jiminian: Tr. 150).  After pulling down her pants and panties, he put his

penis into her vagina until he ejaculated.  (Jiminian: Tr. 153).

At some point, Savinon told Flaco to turn off the highway.  (Jiminian: Tr. 153).  They

continued driving until they reached a park, which Jiminian subsequently learned was Fort Tryon

Park.  (Jiminian: Tr. 153-54).  Savinon exited the car and told Flaco that he wanted him "'to stick

it in'" Jiminian, but Flaco refused.  (Jiminian: Tr. 155).  Savinon gave Flaco a condom.

(Jiminian: Tr. 155-56).  Jiminian said to Flaco, "'No, no, don't put your hand on me.'"

(Jiminian: Tr. 156).  Jiminian locked the door to the car, but Savinon unlocked it by reaching

through the driver's side window.  (Jiminian: Tr. 156).  Savinon then said, "'Flaco, come, the

door is open.  Get in and stick it to her.'"  (Jiminian: Tr. 156).  Jiminian "begged" Flaco not to

listen to Savinon and not to touch her.  (Jiminian: Tr. 156).  Flaco entered the back seat of the car

and told Jiminian that he was "'going to make [Savinon] believe'" that he put his penis in her.

(Jiminian: Tr. 156-57).  Jiminian told Flaco that she did not want him to do that because if

Savninon saw Flaco's "'pants down'" Savinon would make Flaco "'stick it to [her].'"  (Jiminian:

Tr. 157).

Jiminian exited the car and noticed another car behind their car.  (Jiminian: Tr. 157).

Jiminian approached Savinon, who was in the company of another man.  (Jiminian: Tr. 157).

Savinon asked Jiminian, "'Has El Flaco already stick it to you?'"  (Jiminian: Tr. 157).  Savinon

also asked Jiminian if she would do "'whatever'" he said, and she said that she would.

(Jiminian: Tr. 157).  Savinon told Jiminian to go to Flaco so that he could "'stick it to [her],'"

and again she refused.  (Jiminian: Tr. 157).

Savinon then told the man he was with, "'You'll see now.'"  (Jiminian: Tr. 157).

Savinon put Jiminian on her knees and "got his penis out in front of the other guy."  (Jiminian:

Tr. 157).  Savinon then put his penis in Jiminian's mouth and began "pushing" her head.

(Jiminian: Tr. 158).  Savinon also continued asking Jiminian if she "was going to El Flaco," and

Jiminian told him that she would not "do what he was asking [her] to do with . . . Flaco."

(Jiminian: Tr. 163).

Jiminian "was going to go" to another car in the park "to ask for help."  (Jiminian:

Tr. 164).  Savinon "yelled" at Jiminian, and she "went back to him" because she was "afraid."

(Jiminian: Tr. 164).  Jiminian told Savinon that she was going to ask for help if he did not leave

her alone.  (Jiminian: Tr. 164).  Savinon responded, "'Dare, dare.  I will kill you.'"  (Jiminian:

Tr. 165). Savinon took Jiminian back to where the other man was and pulled down her pants and panties. (Jiminian: Tr. 164). He "opened" her vagina and said to the man, "'Look at her pussy, look at her pussy.'" (Jiminian: Tr. 164-65). He also "opened" her "rear" and said, "'Look at her bottom.'" (Jiminian: Tr. 165). At this point, Jiminian was telling the man to tell Savinon "'to leave [her] alone, to let [her] go, not to hurt [her] anymore.'" (Savinon: Tr. 165).

Following this incident, Savinon told Jiminian that she could leave and he told Flaco to take her home. (See Jiminian: Tr. 165-66). Flaco took Jiminian home and stayed with her until 5:30 a.m., while Savinon remained behind with the other man. (Jiminian: Tr. 166-67).[4] At some point, Geiny Paulino saw Jiminian, with whom she shared an apartment. (See Jiminian: Tr. 167; Paulino: Tr. 51). Jiminian "was crying" and had bruises on the right side of her cheek near her mouth and in the "left shoulder area." (See Paulino: Tr. 53-54). Paulino did not see any other bruises or a cut lip or any bite marks. (Paulino: Tr. 59, 61). Jiminian's pants were broken in the zipper area. (Paulino: Tr. 54). Paulino spent one or two hours with Jiminian and during that time Jiminian "was crying a lot" and was acting "very crazy." (Paulino: Tr. 55). Jiminian did not call the police when she got home because she was "very afraid." (Jiminian: Tr. 171).

That same day, Jiminian attended a confirmation class at her church but was unable to "pay very much attention because [she] was feeling very bad." (Jiminian: Tr. 171-72). Father Julio Orlando Torres taught the class. (Jiminian: Tr. 172). Father Torres noticed that Jiminian "was restless," "like on the verge of tears," and "unable to stay in class." (Torres: Tr. 283).

_____

[4] After December 4, 1998, Flaco tried to "have a friendship" with Jiminian "thinking that [she] might get him into trouble." (Jiminian: Tr. 224). In March 1999, Flaco and Jiminian went to Flaco's sister's house in the Bronx. (Jiminian: Tr. 225). Jiminian could not recall if she spoke with Flaco on other occasions in 1999. (Jiminian: Tr. 225).

Father Torres saw Jiminian sit down "for[] a few minutes" and then leave "abruptly." (Torres: Tr. 283). Father Torres and Jiminian left class and went into another room in the church. (Jiminian: Tr. 172; Torres: Tr. 283). In the other room, Jiminian "started crying." (Torres: Tr. 283-84). She did not, however, inform Father Torres that she had been sexually assaulted. (Torres: Tr. 283-84). After class, Jiminian and Father Torres went to Father Torres's office where she told him that "she had been raped." (Torres: Tr. 285). Jiminian took off her blouse and showed Father Torres the marks on her body, including bruises on her back, arms and legs, as well as a cut lip. (See Jiminian: Tr. 172; Torres: Tr. 285). Father Torres told Jiminian that she should contact the police and go to the hospital. (Torres: Tr. 285-86). Jiminian did not immediately contact the police or go to the hospital, however, because she was "very afraid." (Jiminian: Tr. 174).

On Sunday, December 6, 1998, Jiminian went to church, and the following day Father Torres accompanied her to the hospital. (See Jiminian: Tr. 174, 270; Torres: Tr. 287). The physical examination at the hospital revealed a bruise on her right foot and a small bite mark on her right arm. (See Sampson: Tr. 331-32). Jiminian was "very nervous" and unable to eat or sleep following the incident. (See Jiminian: Tr. 175). Jiminian told the personnel at the hospital that she was depressed because of what occurred on December 4th. (Jiminian: Tr. 175). Following this incident, Jiminian's depression is "double, stronger" than what it previously was. (See Jiminian: Tr. 199).

Detective Frank Garrido came to interview Jiminian at the hospital. (Jiminian: Tr. 175; Garrido: Tr. 100). Jiminian was unable to provide the police with Savinon's last name or home

address, but she did provide a pager number and did know Savinon's business address. (See Jiminian: Tr. 175-76; Garrido: Tr. 101).

On December 9, 1998, Detective Garrido arranged for Jiminian to contact Savinon from the Manhattan Special Victim Squad office in order to tape record a conversation between Jiminian and Savinon. (Jiminian: Tr. 178; Garrido: Tr. 101).[5] During the conversation, Jiminian asked Savinon "why he did those things to her, taking off her clothes and ripping her pants." Resp. Mem. at 10. Savinon replied by stating, "'I know what I did.'" Id. After Jiminian said that "he had hit her," Savinon responded by saying, "'Shhssh. Shut up.'" Id. (citation and footnote omitted). Jiminian stated that, "'[t]he only thing [she] want[ed] to know [was] why [he] did that to [her],'" and Savinon responded by stating, "'[a]ll right already.'" Id. She asked why he had "'pull[ed] [her] pants down in front of [his] friend' who was 'following behind [them] in the car,'" and he replied, "'All right already, don't go on.'" Id. (citation omitted) (some alterations in original). Jiminian stated that "she had not been jealous and had been quiet and calm in the car until he 'started hitting [her] in the face'" in front of Flaco, and Savinon responded, "'Listen, listen, listen, listen.'" Id. at 10-11. When she started to describe "the way he 'stuck it in [her] in front of'" Flaco, Savinon asked her what time she would be home and said that he wanted to know when she would arrive home so that he could call her at ten o'clock. Id. (alteration in original). Jiminian said Savinon "had to assure her . . . that he was 'not going to do

[5]The substance of this conversation is summarized in appellate briefs and respondents' submissions to this Court in opposition to the petition. See Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, filed July 28, 2004 (Docket #6) ("Resp. Mem."), at 9-12; Brief for Respondent, dated February 2002 (reproduced as Ex. B to Declaration in Opposition to Petition for a Writ of Habeas Corpus, filed July 28, 2004 (Docket #7) ("Opp. Decl.")), at 14-16. The ten audiotapes containing this conversation were played for the jury at trial. Resp. Mem. at 10 n.8. Respondents, however, are not in possession of the tapes or a transcript of the tapes. Id.

that stuff again,' and he replied, 'No, never.'" Id. at 11. Savinon suggested that they meet "downstairs at her house," but Jiminian said "that she could not trust him after 'what [he] did to [her] in that park in front of [his] friend and Flaco,'" and Savinon replied, "'Look, ok. Let me say, wait, wait, definitely wait, just one thing . . . I'll call at ten, we'll get together, yes or no?'" Id. at 11-12 (citation omitted) (some alterations in original). Jiminian refused, stating, "'Yeah, and then you kill me, just like you said you were going to do that night, that you'd kill me.'" Id. at 12. To this Savinon responded by stating, "'Son of a bitch, you are a big lunatic.'" Id. Finally, Savinon said that "he was going to hang up" and, after Jiminian asked where he was, he said that he was "at his store at '179th & Amsterdam.'" Id.

        A week or two later, Jiminian subsequently visited Savinon's place of business while Detective Garrido and other police officers were stationed outside in a van. (See Jiminian: Tr. 176). Jiminian went inside and asked a man that was there where Savinon was, and the man told her that he did not know. (Jiminian: Tr. 176). The man laughed when she said that she did not believe him, and then he said to her, "'You are the girl who was in Jomas.'" (Jiminian: Tr. 176-77). The man called Savinon and Jiminian spoke with him on the telephone. (Jiminian: Tr. 177). Savinon told Jiminian that he was "'around the world,'" implying that he was out of the country. (See Jiminian: Tr. 177). Jiminian told Savinon that she was going to Puerto Rico to visit her brother, and Savinon told her to either "wait for him" or "come to where he was." (Jiminian: Tr. 265). In any event, Savinon told Jiminian that he would call her as soon as he was in New York. (Jiminian: Tr. 266). On March 2, 1999, Savinon paged Jiminian. (See Jiminian: Tr. 266). Savinon was arrested on March 3, 1999 inside 2402 Amsterdam Avenue. (Garrido: Tr. 103-04).

The prosecution also called Dr. Barbara Sampson, a city Medical Examiner, as an expert witness in forensic pathology and wound interpretation. (See Sampson: Tr. 315-16, 321). Dr. Sampson testified that she was board certified in the areas of anatomical, clinical, and forensic pathology. (Sampson: Tr. 317). She described "pathology" as "the field of medicine that deals with the laboratory aspect of medicine." (Sampson: Tr. 317). She also said that pathology deals with "performing autopsies." (Sampson: Tr. 317). She testified that she performed "approximately 400 autopsies and . . . observed at least ten times that many." (Sampson: Tr. 317).

In her direct testimony, Dr. Sampson testified concerning bruises and/or contusions, what causes bruises to appear on people, whether all human beings bruise alike, and the rate at which bruises disappear on people. (See Sampson: Tr. 318-20). Dr. Sampson stated that she reviewed Jiminian's hospital records in preparation for her testimony. (See Sampson: Tr. 324). Dr. Sampson testified that, based on the notations made on the medical records, she was unable to determine whether Jiminian had bruises on her face or head at the time of her examination. (See Sampson: Tr. 324-25).[6]

Dr. Sampson also described, over defense counsel's objection, the cause of post traumatic stress disorder ("PTSD") and the "symptoms" somebody with PTSD would experience. (See Sampson: Tr. 326-27). Specifically, Dr. Sampson testified that PTSD "is a diagnosis that is made when someone has experienced a very traumatic life event," and that the symptoms include feeling "hopeless[]," replaying the traumatic event "over and over" in one's mind, and being in a

---

[6]The parties stipulated that the hospital records reflected that Jiminian did not have any "masses or bruises to the face or head." (See Tr. 543).

state of "hyperarousal" where one is "very nervous all the time." (Sampson: Tr. 326-27). Dr. Sampson also explained that rape or sexual assault might trigger PTSD, and that there was no time limit that somebody could suffer from PTSD. (Sampson: Tr. 327). Dr. Sampson opined, again over defense counsel's objection, that Jiminian's symptoms, as described in the hospital records, were consistent with PTSD. (See Sampson: Tr. 327-28). On cross-examination, Dr. Sampson conceded that her job primarily involved examining "dead people." (See Sampson: Tr. 328). Dr. Sampson stated that, in her experience testifying in court, she primarily testified on behalf of the prosecution. (See Sampson: Tr. 329). Dr. Sampson confirmed that she was asked to review Jiminian's medical records prior to testifying. (See Sampson: Tr. 329). Dr. Sampson also testified that she worked in an emergency room only as part of her medical school rotations and that she had done so "only very briefly." (Sampson: Tr. 330-31). Dr. Sampson confirmed that she did not have any experience with the procedures in an emergency room for handling a rape case. (Sampson: Tr. 331). Dr. Sampson testified that she never called or spoke with the physician who signed Jiminian's hospital records, and that she never attempted to contact her. (See Sampson: Tr. 330, 338).

### 2. Savinon's Case

a. Character Witnesses. Savinon called four character witnesses. Julio Guridy, a bank officer and 25-year resident of Allentown, Pennsylvania, testified that he knew Savinon for approximately eight to ten years. (Guridy: Tr. 340-41). Guridy said that Savinon had a reputation for being "very peaceful" and "[n]on-violent." (Guridy: Tr. 342). Monica De La Cruz, who was Savinon's girlfriend at the time she testified, stated that she had known Savinon for five years, that he was "a very good man," and that he had a reputation for being a "[n]on-

violent person." (De La Cruz: Tr. 547-48). Rafael Lara, who had known Savinon for forty years, testified that Savinon had a reputation for being "very peaceful" and that he was "[n]ot known as a violent man." (Lara: Tr. 579-80). Finally, David Rivas, who was a "very good friend" of Savinon's father, testified that Savinon had a reputation for not being "a violent type of person." (Rivas: Tr. 598, 600).

b. <u>Savinon's Testimony</u>. Savinon also took the stand on his own behalf and testified as follows:

Savinon was born in the Dominican Republic, and had lived in the United States for twenty years. (Savinon: Tr. 355-56). Until April 2000, Savinon was the co-owner of a telecommunications company called "Phone Card Supermarket" that was located at 2402 Amsterdam Avenue. (Savinon: Tr. 358). Savinon had four employees, and the business primarily involved selling phone cards in bulk. (Savinon: Tr. 359).

Savinon met Jiminian in March 1998 at a party at the home of Benitez, who was the girlfriend of one of Savinon's friends, Pedro Pablo Mestre. (<u>See</u> Savinon: Tr. 360-61; Benitez: Tr. 593; Mestre: 586). Savinon met Jiminian, and they talked at the party. (Savinon: Tr. 362-63). Jiminian told Savinon that she used to see him in the street and that she asked Benitez to introduce her to him. (<u>See</u> Savinon: Tr. 364). Savinon decided to leave, and Jiminian told him that she was going to give him her number for him to call her. (Jiminian: Tr. 364-65). Savinon said that, if she wanted, she could call him, and Jiminian agreed. (Savinon: Tr. 365).

Savinon and Jiminian met again two days later outside of Benitez's house. (<u>See</u> Savinon: Tr. 366). Savinon gave Jiminian $100 at that time so that she could go to the salon. (Savinon: Tr. 367). Savinon left and returned later that same day. (Savinon: Tr. 367). When he returned,

Jiminian asked him to take her home, and he agreed.  (Savinon: Tr. 367).  After reaching her house, Jiminian went upstairs and returned after about 10 minutes.  (Savinon: Tr. 368).  Upon returning to the car, Jiminian said that she wanted to drive around.  (Savinon: Tr. 368).  Jiminian and Savinon went to Riverside Park and Savinon suggested that they "step out for a while."  (See Savinon: Tr. 369).  At the park, Jiminian and Savinon "grabbed each other" and "started kissing."  (Savinon: Tr. 369, 490).  Savinon then dropped Jiminian off and returned to Benitez's house.  (Savinon: Tr. 369).  The "girls" who were there told Savinon that Jiminian "was a little bit crazy," although he thought they were only joking.  (Savinon: Tr. 369-70).

Either the following day or the day after, Jiminian beeped Savinon, and he told her that he would see if after 10 p.m., when he got off work, he was able to pick her up.  (Savinon: Tr. 370).  Savinon picked Jiminian up in his car after 10 p.m.  (Savinon: Tr. 370-71).  They returned to the park, exited the car, and started "kissing" and touching "each other in the private parts."  (See Savinon: Tr. 371).  They returned to the car, Savinon lowered his zipper, and Jiminian performed oral sex on him at that time.  (Savinon: Tr. 371).  Savinon offered to take Jiminian "'to a more comfortable place,'" but she refused.  (Savinon: Tr. 372).  Jiminian told Savinon that he had "a beautiful private part" and that "she liked it very much."  (Savinon: Tr. 372).

Savinon and Jiminian then went to a hotel in New Jersey.  (Savinon: Tr. 372).  Upon arriving at the hotel, Jiminian performed oral sex on Savinon again, but she would not allow him to "penetrate her because [they] had just met very recently."  (Savinon: Tr. 372).  Although Savinon "tried to convince her" otherwise, he eventually told her that it was "'[n]o problem.'"  (Savinon: Tr. 372).  Savinon told her that he was going to sleep, but Jiminian "never stopped" talking and she "continued talking, speaking a lot of things."  (Savinon: Tr. 373).

The following morning, after Jiminian asked Savinon if he was "mad," and he replied that he was not, she "grabbed" his "part" and began performing oral sex. (Savinon: Tr. 373). They then had sex at her request. (See Savinon: Tr. 373). Savinon did not use a condom and in fact never used one when he was with Jiminian. (Savinon: Tr. 376-77). Jiminian said that "she enjoyed it" and that "if she had known she would have done it" the previous night. (Savinon: Tr. 374). They then left the hotel and he dropped her off at her house. (Savinon: Tr. 374). That same evening, Jiminian called Savinon and told him that "she enjoyed it"; she inquired as to when they would "get together again." (Savinon: Tr. 377). That same day, Savinon spoke to Benitez and told her that Jiminian was "'okay'" but that she "'talk[ed] too much.'" (Savinon: Tr. 377-78). Benitez responded by saying, "'I told you she's a little bit crazy, you know.'" (Savinon: Tr. 378).

Then, Savinon left New York City "for a couple of weeks." (Savinon: Tr. 378). Upon returning, Savinon met Jiminian outside Benitez's house and they drove to Fort Tryon Park and had sex. (Savinon: Tr. 379). Thereafter, Jiminian used to call Savinon to see if he "had time to pass by." (Savinon: Tr. 381). He used to tell her that he was "very busy," and she would respond by saying that they "didn't need too much time; that [they] can have a quickie." (Savinon: Tr. 381). Savinon subsequently "went to look for" Jiminian, and then they "went to the same park" and had sex. (Savinon: Tr. 381). Each time Savinon saw Jiminian he gave her money. (Savinon: Tr. 383). He also gave her a television. (Savinon: Tr. 383-84).

Savinon testified that their relationship continued in this manner for the next eight months. (Savinon: Tr. 384). They would meet for dates three or four times a month and sometimes more often than that. (See Savinon: Tr. 422-23). Savinon testified that, while at

restaurants, Jiminian would "always" be "touching [him] in [his] private parts." (Savinon: Tr. 385). When they would go to restaurants, Jiminian would ask Savinon to feed her food and liquor from his mouth and he would do so, although he didn't like doing it. (Savinon: Tr. 385, 396, 451). Jiminian would often refer to Savinon's "private part" as "hers" (Savinon: Tr. 388), and she "had some uncontrollable desire to have oral sex with [him]." (Savinon: Tr. 442). Savinon testified that on one occasion they had oral sex in a moving vehicle with other people in the car, and that he was unable to refuse because she was "very insistent" and "very dominant with" him, asking him "who . . . the owner of [his] private part" was. (See Savinon: Tr. 386, 438, 441).[7] Later that same night they went to the Bronx and had sex in a car on the roof of a public parking lot. (Savinon: Tr. 386). While having sex that night, she "penetrated a finger" in his anus, telling him that he "had to become a man." (Savinon: Tr. 386-387). She then pulled the finger out and put it in her mouth. (Jiminian: Tr. 387). Jiminian subsequently called Savinon while he was at work and told one of his friends about what she had done. (See Savinon: Tr. 387-88, 508). On another occasion they were out to dinner at a restaurant when she "continuously" touched him in his "private part" despite his telling her to "relax." (Savinon: Tr. 388-89). That night they had sex in the office of the restaurant. (Savinon: Tr. 389). Jiminian would often talk about their sex life with others and, "if she felt comfortable," would tell people that she "liked" Savinon's "private parts." (Savinon: Tr. 508-09).[8]

---

[7]During her cross-examination, Jiminian had denied ever performing voluntary oral sex with Savinon. (See Jiminian: Tr. 211-12).

[8]Mestre testified to an incident during the summer of 1998 when he left a restaurant, Victor's Café, with Savinon and Jiminian. (Mestre: Tr. 587). Mestre left the restaurant in a car separate from Savinon and Jiminian. (Mestre: Tr. 587). While stopped at a light, Jiminian gestured to Mestre, and when he looked over he saw Jiminian holding Savinon's penis "with her

On December 4, 1998, after closing his office at approximately 10 p.m., Savinon left to go to Jomas Bar, where he was to judge a dance contest. (Savinon: Tr. 389-91). Savinon did not call Jiminian to go on a date that evening. (See Savinon: Tr. 389). Flaco told Savinon that he wanted to go with him, and Flaco drove to the event. (Savinon: Tr. 390-92).

On the way to the bar, Savinon saw Jiminian outside her house speaking to a person who was in a jeep. (Savinon: Tr. 392). Savinon told Flaco to stop the car, and Savinon and Jiminian began talking. (See Savinon: Tr. 392-93). He "gave her $100, and . . . told her that [he] would call her tomorrow." (Savinon: Tr. 393). Jiminian insisted on going with them, however, and convinced Savinon to let her do so. (Savinon: Tr. 393). Jiminian changed her clothes, put on a "very sexy . . . little blouse," and then got into the car. (See Savinon: Tr. 393). On the way to the bar, Jiminian told Savinon "not to worry" if he found another woman because she was "liberal." (Savinon: Tr. 395).

Savinon, Flaco, and Jiminian arrived together at Jomas around 11:30 p.m. (Savinon: Tr. 394). They went to a table and ordered a bottle of Johnnie Walker. (Savinon: Tr. 394). While sitting at the table, Jiminian "started to touch" him; in response, Savinon "got up" and was "patient" with her. (Savinon: Tr. 395). Jiminian indicated to Savinon that she wanted to participate in a dance contest with Flaco, and they filled out the application. (Savinon: Tr. 395-96). She did not, however, participate in the contest because "she felt that everybody was looking at her." (Savinon: Tr. 396, 398). By this time, Jiminian had taken liquor from Savinon's

---

two hands." (Mestre: Tr. 587). She was "making signs" to Mestre as to say, "'Look, look what I'm doing.'" (Mestre: Tr. 587). He then saw her bend over, and at that time the light turned green. (Mestre: Tr. 587-88).

mouth, which was her idea and a reason "why sometimes people didn't enjoy being with her." (Savinon: Tr. 396).

Savinon judged the contest and returned to the table following the competition. (Savinon: Tr. 396-98). Then, he danced with Jiminian, and after dancing, he went to the bar to talk to a television reporter whom he knew and the reporter's girlfriend. (See Savinon: Tr. 397-99). Savinon was not flirting with the man's girlfriend. (Savinon: Tr. 399).

Jiminian approached Savinon at the bar and asked him for the car keys, which Savinon did not have. (Savinon: Tr. 399-400). As the two walked towards Flaco to see if he had the keys, Jiminian told Savinon that she was leaving. (Savinon: Tr. 400). Savinon told her that she should not leave because she was with a "gentleman" and that she should sit down and relax. (Savinon: Tr. 400). Jiminian then accused Savinon of kissing the girl he was talking to at the bar. (Savinon: Tr. 400). She also told Savinon that "everybody was looking at her." (Savinon: Tr. 400). Savinon responded by saying that the girl at the bar was his friend's girlfriend. (Savinon: Tr. 400). Savinon also whispered in Jiminian's ear, and when they got back to the table, he hugged and kissed her "many times" – all of which seemed to relax her. (Savinon: Tr. 400, 402).

Then, Savinon told Jiminian that he had to go talk to people at the bar. (Savinon: Tr. 403). Jiminian told Savinon that she wanted a kiss and a drink, so he "gave" her two drinks. (Savinon: Tr. 403). Savinon returned to the bar and saw Jiminian looking at him while he was talking to other people. (See Savinon: Tr. 403). Flaco approached Savinon and told him that Jiminian "was impossible" and that she was threatening to "jump" on the other girl. (Savinon:

Tr. 403). Savinon returned to Jiminian, hugged her, and told her to wait in the car with Flaco, which she did. (Savinon: Tr. 404).

When Savinon got to the car, Jiminian and Flaco were talking to one another. (Savinon: Tr. 404-05). Jiminian told Savinon "not to touch her" because she said that he had "touch[ed] the other girl" and that he was "'going to get together with her'" later on. (Savinon: Tr. 405). Jiminian started crying "without any control" and she told Savinon that he had "put her in the middle of a shameful situation." (Savinon: Tr. 405). She "continued speaking, speaking," and Savinon invited her to come to the back seat, which she did. (Savinon: Tr. 405-06). Savinon told Jiminian that he would not see the other woman, but she insisted that he would and that he was "with" that woman. (Savinon: Tr. 406).

Savinon then told Flaco to take Jiminian home. (Savinon: Tr. 406). At that point, "she exploded," saying that he was "going with" the other woman. (Savinon: Tr. 406). Savinon remained "quiet" during this time. (See Savinon: Tr. 406). After "[s]he calmed down a little bit," she said that if he was "not going with the other girl" that they should have a "quickie." (Savinon: Tr. 406). He told her that he had to go to a restaurant, the "Quinto," and she continued to insist that he was "going with" the other girl. (Savinon: Tr. 406). Savinon again denied that he was going with the other girl, and she responded by saying, "'[w]ell, let's have a quickie then.'" (Savinon: Tr. 406). After "a lot" of discussion, Savinon agreed and they went to the park (Savinon: Tr. 407) – presumably, Fort Tryon Park. Upon arriving at the park, Savinon told Flaco to get out of the car because he was "going to have a talk with her to relax her," and Flaco left. (Savinon: Tr. 407). Savinon "stayed with" Jiminian there "for a while, [a] good while," and they had sex in the car. (See Savinon: Tr. 407). Savinon told Jiminian that he had to go, and she kept

insisting that he "was going to the other girl." (Savinon: Tr. 407). At that point, Savinon was "getting to the end of [his] patience," so he told her, "Yes, . . . I am going to the other girl," and then he exited the car. (Savinon: Tr. 407). When he got out of the car, she came up behind him, hugged him, and told him that what he did to her was "embarrassing," that "everybody who was there [was] looking at her," that he "did it on purpose to her," and that he "was with the other girl." (Savinon: Tr. 407). Savinon hugged her, told her that he "pleased" her, that he did not "feel like having sex again," and that he would not "get with that girl." (Savinon: Tr. 407). Jiminian, however, just "continued talking." (Savinon: Tr. 407).

Flaco re-entered the car, and Jiminian continued "speaking, talking, talking." (Savinon: Tr. 408). Jiminian told Savinon that her pants and zipper got torn, and he told her that was because she was "too anxious." (Savinon: Tr. 408). Jiminian got into the front seat of the car, Savinon got in the back seat, and they left. (Savinon Tr. 408). Jiminian "continued talking" and Flaco looked at Savinon as if to say, "'I told you, . . . don't hang out with her.'" (Savinon: Tr. 408). At 181st Street, Savinon told Flaco to stop the car, and Savinon told Jiminian not to call him anymore. (Savinon: Tr. 408). Jiminian was "very anxious," so Savinon asked Flaco to take her home. (Savinon: Tr. 408). Savinon exited the car, and then Flaco and Jiminian left. (Savinon: Tr. 408). Savinon went to the "Quinto" by taxi, and Flaco arrived there later on. (See Savinon: Tr. 408).

Savinon heard from Jiminian the following day when she contacted him by telephone. (Savinon: Tr. 409). She told him that he "went [with] the other girl anyway," that he would "pay for it," and that he had to get her a bottle of champagne because "there was a bottle of champagne at the bar." (Savinon: Tr. 409). Savinon "wasn't paying attention, and she continued

21

talking." (Savinon: Tr. 409). Savinon then repeatedly said to her, "When you become a person again, you call me. Otherwise, please don't call me." (Savinon: Tr. 410).

With respect to the tape-recorded conversation of December 9, 1998, Savinon testified that he "wasn't paying attention" to what Jiminian was saying. (See Savinon: Tr. 411). He testified that "[o]n some occasions she said certain things that got [him] confused," but that when she did so he "didn't answer." (Savinon: Tr. 411). Savinon also testified that during certain portions of the conversation, he was talking to someone else in his office. (Savinon: Tr. 12). During the conversation he was saying "Yes, yes, um-umm, okay," because there were "people with [him] in the office that [he] was taking care of." (Savinon: Tr. 414). During the conversation he repeatedly told her to call or meet him at ten o'clock because "it was difficult for [him] to get on the phone in a personal way and leave the office" before that time. (Savinon: Tr. 410).

After Jiminian did not show up to meet him on the night of December 9th, Savinon tried calling her on several occasions and beeped her, but she did not call back. (See Savinon: Tr. 414-15). On December 19th, Savinon left for the Dominican Republic because his mother was undergoing a medical procedure. (See Savinon: Tr. 415-16). He spoke to Jiminian while he was away. (See Savinon: Tr. 416-17). Then, he attempted to contact Jiminian on the day that he returned to New York by beeping her and calling her, but she did not answer. (Savinon: Tr. 418). He was arrested the following day. (Savinon: Tr. 418).

3. The People's Rebuttal Case

Jiminian was recalled as a rebuttal witness. (See Jiminian: Tr. 607). She testified that she never had sexual intercourse or oral sex in Riverside Park with Savinon. (See Jiminian:

22

Tr. 607).  Jiminian testified that she in fact had never even been to Riverside Park.  (Jiminian: Tr. 607).  She never had sex with Savinon in Fort Tryon Park before December 4, 1998, and had never visited that park with him before.  (Jiminian: Tr. 608).  When she went to the hotel with Savinon she did not have oral sex with him, either on the way there or at the hotel.  (Jiminian: Tr. 608).  Nor did she ever have oral sex with him while others were in a car with them.  (Jiminian: Tr. 608-09).  She did have sex with Savinon in the office of a restaurant, but it was his idea. (Jiminian: Tr. 609).  She never inserted her finger in Savinon's anus and then put her finger in her mouth.  (Jiminian: Tr. 609-10).  Nor did she ever hold Savinon's penis in her hands while Mestre was watching.  (Jiminian: Tr. 611).

     B.  The Missing Witness Charge

     There was testimony during trial concerning the relationship between Flaco and Savinon. Savinon testified that, although Flaco did not work for him, he was an independent salesperson for Savinon's phone card business.  (See Savinon: Tr. 390).  Flaco would also answer the phone on occasion at Savinon's business.  (Savinon: Tr. 454).  Savinon also described Flaco as his "client" for a period of less than a year, and that prior to that he used to see him "sporadically." (Savinon: Tr. 454).  Savinon also testified, however, that he and Flaco were friends who had known each other "for a long time."  (Savinon: Tr. 455, 457).  Savinon stated that he and Flaco did not really see each other socially (see Savinon: Tr. 455, 457), but he also testified that he had extended credit to Flaco in the past, and had also loaned him his Lexus on occasion to visit clients.  (See Savinon: Tr. 391, 454, 456).  Savinon did not know Flaco's address and only knew how to reach him through his beeper.  (Savinon: Tr. 456).

In an attempt to find Flaco for the purposes of his case, Savinon continuously beeped him and talked to a girl who knew him. (Savinon: Tr. 460-61). Flaco eventually returned one of Savinon's "beeps" and Savinon "explained to him what was going on." (Savinon: Tr. 462). On a Sunday during the trial, Savinon spoke to Flaco "at the attorney's office." (Savinon: Tr. 462-63). At this meeting between Savinon, Flaco, and Savinon's attorney, Savinon requested that Flaco come to court to testify. (Savinon: Tr. 537). Flaco declined, however, because he had "legal problems" and "had been deported" because "he was illegal here." (Savinon: Tr. 537). Flaco was not served with a subpoena at this meeting. (Savinon: Tr. 539).

At the charge conference, the court stated that it would not deliver a missing witness charge for either side "[u]nless specifically requested" to do so. (Tr. 552). The prosecution subsequently requested that the court issue a missing witness charge with respect to Flaco. (Tr. 555). Defense counsel opposed this motion, arguing that Flaco was "equally available" to both parties. (Tr. 555).

The court granted the prosecution's request for the charge, stating that Flaco's testimony was "material," and that he was both "available" to Savinon and within his "control." (Tr. 574-76).[9] The court, therefore, delivered the following instruction to the jury:

> Now, as you know, there is also evidence in this case that another person was present at the time of the alleged incident in the car at Fort Tryon Park, namely, Luis Camacho, who's also been referred to during trial as "Flaco," whose testimony, if he had been called as a witness by the

---

[9] After the court granted the prosecution's request, defense counsel sought to "make a record," stating that "Flaco indicated he would not come to court under any circumstances" and that, at a sidebar conference, defense counsel had asked the prosecutor to give Flaco "safe passage" and she did not reply. (Tr. 576). Defense counsel went on to state that, if the prosecutor were to "guarantee[] that [Flaco] will not be arrested for this or any other crime that she becomes aware of, then I will be glad to see if I can produce him." (Tr. 576).

defendant, possibly could have been of material help and assistance to you, the jury, in deciding the case.

You may not, under the law, speculate or guess as to what or how Flaco would have testified if he were called; however, from the failure of the defendant to call Flaco, the law permits, but does not require, you to infer, if you believe it proper to do so, that if Flaco would have been called by the defendant to testify, his testimony would not have supported the testimony of the defendant.

You may so infer only if you are satisfied that Flaco was under the control of the defendant and was available to be called by the defendant if he had wished to do so.

In that regard, however, you may consider the explanation offered during the trial by the defendant for the failure to call Flaco.

If that explanation satisfies you that the witness was not under the control of the defendant, or was unavailable to be called as a witness by the defense, or in considering all the other evidence in the case you do not find that the witness was under the defendant's control or available to the defendant, you may not draw any inference adverse to the defendant for the failure to call Flaco.

(Tr. 697-99).

C.  Verdict and Sentencing

Savinon was convicted by a jury of one count of Rape in the First Degree under N.Y.P.L § 130.35(1), and one count of Sexual Abuse in the First Degree under N.Y.P.L. § 130.65(1).  (Tr. 750).  He was acquitted of Sodomy in the First Degree.  (Tr. 750).  On May 11, 2001, he was sentenced to concurrent, determinate terms of nine years on the rape count and five years on the sexual abuse count.  (S. 19-20).

D.  Savinon's Direct Appeal

In September 2001, Savinon, through new counsel, appealed his conviction to the Appellate Division, First Department, raising the following grounds for relief: (1) "the trial

court's granting of a missing witness charge was reversible error"; (2) "[p]rosecutorial misconduct warrants the setting aside of the verdict and the granting of a new trial"; (3) "[t]he court improperly permitted the People to call Sandra Jiminian in rebuttal, improperly permitted expert opinion and unduly limited defense evidence"; (4) "[t]he trial court erred in refusing to conduct a more thorough inquiry as to the qualifications of juror #6 and in not discharging said juror"; (5) "[t]he trial court erred in granting the People's request for a mistrial"; and (6) "[t]he trial court improperly denied" a post-trial motion "pursuant to [the] C.P.L. without a hearing." Brief for Defendant-Appellant, dated September 17, 2001 (reproduced as Ex. A to Opp. Decl.) ("Pet. App. Div. Br."), at 29, 38, 46, 50, 53, 58.  In addition, Savinon argued that he "was denied effective assistance of counsel" because (1) his trial counsel's opening statement resulted in a mistrial due to his failure to make an adequate proffer concerning Jiminian's three prior abortions; (2) his trial counsel failed to secure Flaco's testimony either through a subpoena or a material witness order; and (3) his trial counsel failed to object to the qualifications and testimony of the prosecution's expert witness, Dr. Sampson.  Id. at 55-57.

In a decision dated April 30, 2002, the Appellate Division unanimously affirmed Savinon's conviction.  People v. Savinon, 293 A.D.2d 413, 413 (1st Dep't 2002).  With respect to the missing witness instruction, the Appellate Division held that the trial court "properly granted the People's request for [the] missing witness charge with regard to defendant's failure to call his close friend and business associate who was present during the incident" in light of record evidence "establish[ing] that defense counsel had interviewed the witness during the trial."  Id.  According to the court, "[t]he charge was warranted since the witness had material,

26

non-cumulative knowledge and was available and within defendant's 'control' for purposes of a missing witness charge." Id. (citation omitted).

The court also rejected Savinon's ineffective assistance of counsel claims, concluding that "defendant has failed to present an adequate record . . . since his complaints require an amplification of the record to ascertain the reasons for defense counsel's strategic decisions." Id. at 414. In any event, the court stated, "to the extent the present record permits review, we find that defendant received meaningful representation." Id. (citation omitted).

_____The Appellate Division also concluded that the trial court did not err in inquiring as to the qualifications of a juror and in refusing to discharge that juror, and that the trial court properly limited the testimony of a defense witness as well as "improper" attempts by counsel to impeach the victim. See id. at 413-414. Finally, the court found that Savinon's remaining claims were "unpreserved" for review and stated that, even if it were to review those claims, it "would find no basis for reversal." Id.

_____On October 15, 2002, the Honorable George Bundy Smith of the New York State Court of Appeals granted Savinon leave to appeal to that court. People v. Savinon, 98 N.Y.2d 772 (2002). In his brief to the Court of Appeals, Savinon raised the same claims set forth in his brief to the Appellate Division with the exception of his claims that the trial court erred in granting the prosecution's request for a mistrial and in denying his post-trial motion. See Brief for Defendant-Appellant (reproduced as Ex. E to Opp. Decl.) ("Pet. Ct. App. Br."), at 30, 40, 48, 52, 55.

On June 5, 2003, the Court of Appeals affirmed the order of the Appellate Division. People v. Savinon, 100 N.Y.2d 192, 192 (2003). The court stated that the question presented by

Savinon's appeal was "whether the trial court improperly granted the People's request for an adverse inference instruction after defendant failed to produce his friend and former employee, the only witness to the crimes charged." Id. at 194. The court stated that because "Camacho was a key witness," and since "his testimony would have been material and noncumulative," whether the trial court's adverse inference instruction was proper turned on whether he was within defendant's "control" and whether he was "available" to the defendant. Id. at 197. On the question of "availability," the court noted that "Camacho's disinclination [to testify] . . . was due to his alleged fear of deportation." Id. at 199-200. The court went on to state as follows:

> Defendant was on trial for uncommonly heinous crimes. He testified that complainant's accusation was a lie. If (as defendant swore) his version was true, his friend Camacho was the only person in the world who could rescue him from the prospect of a lengthy prison term. Under these circumstances one would expect an accused to go to Herculean lengths to get Camacho before the jury. Surely those efforts would include a subpoena if not a material witness order. Counsel's statement that Camacho would not appear was thus insufficient. . . . Given Camacho's meeting with defendant and counsel during trial, the court did not abuse its discretion in concluding that Camacho could have been produced if defendant earnestly wanted him and was prepared to take appropriate measures to bring him in. . . . Here, counsel's failure to subpoena Camacho, having just met with him, justified the trial court's determination that the defense did not rebut the People's prima facie showing of the witness's availability.

Id. On the question of "control," the court stated as follows:

> Here, although their relationship purportedly came to an end shortly after the episode, defendant and Camacho had been friends and business associates. Indeed, under either side's version of the alleged crime, defendant was so bonded with Camacho as to have had sex with complainant with Camacho nearby. The closeness of this relationship, even if it had not remained current, was enough to substantiate the prosecution's request for a missing witness instruction.

Id. at 201 (citation omitted).  In reaching this conclusion, the court rejected Savinon's argument

that Camacho was not in his "control" in light of Camacho's supposed relationship with

Jiminian, stating:

> Camacho drove the complainant home and stayed with her for a few hours.
> He also visited her and once went to her sister's house.  Complainant testified
> that she had no contact with Camacho for over a year before trial, did not know
> his whereabouts and did not even know his last name; she knew him only as
> "Flaco."  In all, it did not begin to approach the level of friendship that Camacho
> had with defendant.  In any event, as instructed by the trial court, the jury was
> free to decide for itself whether to apply what the court correctly described as
> a permissive adverse inference.

Id.  The Court of Appeals, therefore, concluded that "the trial court did not abuse its discretion in

determining that both the availability and favorability elements were met, and giving the missing

witness instruction."  Id.  Finally, the court determined that Savinon's "challenges to several of

the prosecutor's statements during summation [were] unpreserved" and that "[h]is remaining

contentions [were] without merit."  Id.

### E.  Savinon's N.Y. Crim. Proc. Law § 440.10 Motions

#### 1.  September 2002 Motion

Following the adjudication of his appeal by the Appellate Division, Savinon moved pro

se to vacate the judgment of conviction pursuant to N.Y. Crim. Proc. Law ("CPL")

§ 440.10[1][h] ("September 2002 § 440.10 Motion") on the ground of ineffective assistance of

trial counsel.  See Notice of Motion, dated September 6, 2002 (reproduced as Ex. H to Opp.

Decl.) ("Sept. 2002 Notice of Motion").  Specifically, Savinon argued that his trial counsel was

ineffective for: (1) delivering an opening statement that resulted in a mistrial, failing to obtain all

Rosario materials, not adequately researching New York's rape shield law, and not seeking a

pretrial evidentiary hearing; (2) failing to secure Camacho's testimony through a subpoena or material witness order; and (3) failing to object to Dr. Sampson's qualifications and testimony and failing to call an expert to rebut Dr. Sampson's testimony. Affidavit in Support of Motion to Vacate the Judgment (reproduced as Ex. H to Opp. Decl.) ("440.10 Aff. I"),[10] at 13, 15, 19.

On November 15, 2002, Justice Gregory Carro of the New York County Supreme Court denied Savinon's motion. See Decision and Order, dated November 15, 2002 (reproduced as Ex. J to Opp. Decl.) ("440.10 Decision I"), at 7. As an initial matter, the court noted that Savinon's ineffective assistance of counsel claim was "properly raised" in a CPL § 440.10 motion since it was "based at least in part on material facts that do not appear on the record." Id. at 3. The court concluded, however, that Savinon's motion papers were deficient because they did not "include an affirmation from trial counsel explaining the strategy behind his decisions, or any explanation as to why the affidavits are missing." Id. at 4 (citation omitted). The court also went on to state that, "after reviewing the trial transcript objectively," Savinon's claims must fail because defense counsel's decisions about which he complained "had a strategic or other legitimate purpose that a reasonably competent attorney might have pursued." Id.

Specifically, the court found that defense counsel's statements concerning Jiminian's prior abortions was nothing more than a "calculated risk that his remark would plant the seeds of [a] defense in the jurors' minds" that it was the abortions, and not the alleged rape, that caused her to be depressed. Id. at 5. The court found that, "by connecting the evidence to the witness' state of mind," trial counsel, "astutely, albeit unsuccessfully, sought to avoid the restrictions imposed by the rape shield law" while "at the same time suggest[ing] to the jury that the

---

[10]The Court has penciled in page numbers to the 440.10 Aff. I for ease of reference.

complaining witness had had many sexual encounters, thereby furthering the defense position

that she was sexually aggressive and that she might have been raped by someone other than the

defendant." Id. at 4. With respect to the expert evidence issue, the court found that trial counsel

had in fact set forth several objections to Dr. Sampson's testimony concerning PTSD. See id. at

5. The court also concluded that trial counsel may have strategically elected to forego objecting

to Dr. Sampson's qualifications to render an opinion on PTSD, and instead challenged her

qualifications on cross-examination. See id.

Finally, the court also rejected Savinon's claim that trial counsel was ineffective for

failing to obtain Camacho's testimony. See id. at 5-6. In rejecting Savinon's arguments on this

score, the court stated as follows:

> Underlying the defendant's contention that trial counsel was ineffective for
> failing to subpoena Luis Camacho is the premise that Mr. Camacho would
> have given exculpatory testimony. However, even though the defendant
> alleges that trial counsel interviewed Mr. Camacho before trial, he has not
> submitted an affidavit from either individual showing how Mr. Camacho
> would have benefitted him if he had been called as a witness. The defendant's
> hearsay allegations are insufficient to create an issue as to this nonrecord
> fact. The defendant's conclusory allegations that Mr. Camacho's testimony
> was exculpatory, unsupported by evidentiary facts, are not sufficient to rebut
> the presumption that trial counsel acted in a competent manner. It is not
> disputed that counsel interviewed Mr. Camacho. His decision not to use all
> available procedures to secure the witness must be viewed as a strategic
> legal decision not to pursue a witness whose testimony he viewed as weak.

Id. at 5-6 (citations omitted). In addition, the court found that because "Camacho had a prior

criminal conviction, had entered the country illegally, and was subject to deportation," his

testimony, even had it favored the defense, would have been "seriously undermined." Id. at 6.

Savinon did not seek leave to appeal the denial of this motion to the Appellate Division.

## 2. The Original Petition and the September 2004 § 440.10 Motion

On February 25, 2004, Savinon, now represented by counsel, filed the instant petition for writ of habeas corpus in this court. See Petition Under 28 U.S.C. § 2254 For Writ Of Habeas Corpus By A Person In State Custody (reproduced as Ex. K to Opp. Decl.). In his original petition, Savinon contended that: (1) the trial court erroneously granted the prosecution's request for a missing witness charge, thereby depriving him of due process and a fair trial, id. at 5; and (2) his trial counsel was ineffective, id. Respondents submitted papers in opposition. See Opp. Decl.; Resp. Mem. In a reply memorandum, Savinon attached an affidavit from Camacho, in which Camacho averred that Savinon did not rape Jiminian and that the District Attorney prevented him from testifying on Savinon's behalf. Supplemental Affirmation in Opposition to Petition for a Writ of Habeas Corpus, filed March 15, 2005 (Docket #17) ("Supp. Aff."), ¶ 2; see Camacho Affidavit (reproduced as Ex. A to Supp. Aff.) ("Camacho Aff.").

By letter dated August 18, 2004, Savinon requested that his petition be stayed so that he could exhaust a newly discovered evidence claim based upon Camacho's affidavit. See Letter from Lawrence F. Ruggiero to the Honorable Gabriel W. Gorenstein, dated August 18, 2004 (reproduced as Ex. B to Supp. Aff.). By order dated August 20, 2004, this Court stayed the petition and placed the case on the suspense docket. Order, filed August 23, 2004 (Docket #12).

On September 30, 2004, Savinon moved in the New York Supreme Court to vacate his conviction pursuant to CPL § 440.10 ("September 2004 § 440.10 Motion"). See Notice of Motion, dated September 30, 2004 (reproduced as Ex. D to Supp. Aff.) ("Sept. 2004 Notice of Motion"). Annexed as Exhibit B to Savinon's submissions in support of the motion was the

same affidavit that had been submitted as part of the reply brief in federal court.  See Camacho

Aff.

In the affidavit, Camacho avers that "investigators from the District Attorney [sic]

Office" came to see him during the investigation of this case and that he told them that "nothing

happened" in the car on December 4, 1998, between Savinon and Jiminian.  Id. ¶¶ I-II.  Camacho

explains that, during the ride, "Jiminian was very angry because Savinon was talking with other

lady [sic] at the bar," that she was yelling at Savinon, and that Savinon attempted to calm her

down by talking to her.  See id. ¶¶ II-III.  Camacho also avers that "[t]here was no rape in the car

in [sic] any moment" and that Savinon did not order him to have sex with Jiminian.  Id. ¶ IV;

accord id. ¶ VIII.  Camacho asserts that, after he disclosed this information to the investigators,

they informed him that he would be called to testify on Savinon's behalf, and he indicated that he

was willing to do so "because no rape took place."  Id. ¶ V.  Camacho avers that he then had the

following exchange with the investigators:

> [T]he investigators told me I better think twice about being a witness for
> Savinon.  They told me they would make . . . lots of trouble for me, and
> have me deported out of this country.  They told me how easy [sic] they
> could set me up with a drug arrest and send me to prison.  They remind [sic]
> me that this conversation was private and confidential and no[t] to tell
> Savinon or anyone else about it and be nice with us if you want to stay in
> this country with your family and you should get lost until this trial be [sic]
> over.

Id. ¶ VI.  Camacho states that he "couldn't help Savinon or be a witness for him because [he] was

in fear of being deported or arrest[ed] by the investigators from [the] District Attorney [sic]

office."  Id. ¶ VII.  In support of the motion, Savinon's counsel averred that, "[u]pon information

and belief, Mr. Camacho would now be willing to testify on behalf of Mr. Savinon at an

evidentiary hearing on this motion to assert the claims stated in the affidavit." Affirmation, dated

September 30, 2004 (reproduced as Ex. D to Supp. Aff.) ("440.10 Aff. II"), ¶ 11.

In an affirmation submitted in support of the motion, counsel argued that Savinon sought

to vacate his conviction "on the grounds of improper and prejudicial conduct not appearing in the

record, namely intimidation by state agents of a witness favorable to the defense, newly

discovered evidence establishing the defendant's actual innocence, and ineffective assistance of

trial counsel in violation of the New York State and Federal Constitutions." Id. ¶ 1. The

affirmation stated that "newly discovered evidence" – that is, the Camacho affidavit – altered the

"underpinnings" of the court's denial of the September 2002 § 440.10 motion, because the

presentation of this evidence "would have resulted in a vacatur of the judgment." Id. ¶ 35.

Counsel averred that the affidavit established that Camacho "would . . . have provided favorable

testimony for the defense; testimony that would have completely exonerated Mr. Savinon." Id.

Counsel also argued that Savinon's trial counsel violated his Sixth Amendment right to effective

assistance of counsel by "failing to subpoena . . . Camacho or to request a material witness order

which would have forced Camacho to appear in court and explain his unwillingness to testify."

Id. ¶ 35; accord id. ¶¶ 37, 39. Finally, the affirmation argued that "an evidentiary hearing should

be held pursuant to C.P.L. § 440.10(1)(f) because . . . Camacho's affidavit reveals that he was

intimidated by agents for the prosecution's office." Id. ¶ 41. The State opposed the motion,

arguing that nobody from the District Attorney's Office ever interviewed or contacted Camacho

and that trial counsel was not ineffective. See Affirmation in Response to Defendant's C.P.L.

§ 440.10 Motion (reproduced as Ex. E to Supp. Aff.) ("Sept. 2004 § 440.10 Opp."), at 3.

On November 9, 2004, Justice Carro denied the motion. See Decision and Order, dated November 9, 2004 (reproduced as Ex. F to Supp. Aff.) ("440.10 Decision II"), at 6. The court rejected Savinon's "newly discovered evidence" claim, noting that although the affidavit "on its face is exculpatory," it did not require that the conviction be vacated. See id. at 3-4. In so doing, the court stated that

> [a]lthough Camacho avers in his affidavit that no rape occurred, he also states unequivocally that 'nothing happened,' only talk, on the trip home. The only logical inference to be drawn from these allegations is that during the ride to Manhattan he observed no sexual intercourse. Therefore, Camacho's testimony would have contradicted the defendant's testimony on a point crucial to the defense, and raised a sharp issue as to the defendant's credibility in addition to the clear credibility issue already presented by the complainant's testimony.

See id. at 4.[11]

The court also rejected the "newly discovered evidence" claim on the ground that Savinon was unable to establish, as he was required to do under CPL § 440.10(1)(g), "that the new evidence was discovered since the entry of the judgment of conviction and that it could not have been produced by the defendant at the trial even with due diligence." Id. at 5. The court reasoned that Savinon was unable to satisfy this standard given Camacho's meeting with Savinon and counsel during trial, as well as Savinon's own argument – made in support of the ineffective

---

[11]Camacho's statement that "nothing happened . . . on the trip home" does not on its face contradict Savinon's testimony. This is because Savinon himself testified that nothing sexual occurred during the ride to Manhattan (Savinon: Tr. 405-07). Nonetheless, Camacho's affidavit states that he simply "drove [Jiminian] to her house" that night, Camacho Aff. ¶ IV, and makes no mention at all that the car stopped in Fort Tryon park (or any other park). Nor does it state that Savinon told Camacho to leave the car or that Camacho left Savinon and Jiminian alone for time period sufficient for them to have sex – all of which Savinon had testified to at trial (Savinon: Tr. 407-09). Thus, based on the version of events given in Camacho's affidavit, it is a reasonable inference that Camacho's affidavit was inconsistent with Savinon's testimony.

assistance of counsel claim – that trial counsel "was aware during trial that Camacho would exculpate the defendant yet incompetently failed to subpoena him." Id.

The court rejected the ineffective assistance of counsel claim because the Camacho affidavit, insofar as it was "at odds with the entire theory of the defense," showed that "trial counsel had a strategic and legitimate reason for not pursuing the witness." Id.

The court also denied Savinon's request for a hearing. See id. at 5-6. The court did so in light of the prosecutor's denial "that an investigator from her office ever interviewed Camacho," and because "the affidavit itself raises questions about the truth of Camacho's allegation, such as why he waited until May . . . 2004, three years after the defendant was convicted, to come forward, and why he is now not afraid of deportation." Id. at 6. The court also concluded that, even assuming the intimidation alleged by Camacho occurred, Savinon's request for a hearing must be rejected because he was unable to "demonstrate that [he] suffered actual prejudice" from Camacho's failure to testify, as he was required to do under the applicable law. See id. at 5-6.

On January 18, 2005, the Appellate Division, First Department, denied Savinon's application for leave to appeal the decision denying the motion. Certificate Denying Leave, dated January 4, 2005 (reproduced as Ex. G to Supp. Aff.) ("Leave Cert.").

F. Savinon's Amended Habeas Petition and Subsequent Submissions

On February 2, 2005, Savinon submitted an amended petition and supporting papers. See Declaration in Support of Amended Petition, filed February 2, 2005 (Docket #14) ("Am. Petition Decl."); Declaration of Exhaustion of State Remedies, filed February 2, 2005 (Docket #13). In the amended petition, Savinon claims he is entitled to habeas relief because his right to effective assistance of counsel under the Sixth Amendment was violated due to: (1) trial counsel's failure

to competently handle the missing witness issue, which included "failing to subpoena . . . Camacho or to request a material witness order which would have forced Camacho to appear in court and explain his unwillingness to testify," Am. Petition Decl. ¶¶ 32, 38-39; (2) trial counsel's reference to Jiminian's three prior abortions in his opening statement in the prior proceeding resulting in a mistrial, see id. ¶¶ 41-48; (3) trial counsel's failure to competently challenge the qualifications and testimony of the People's expert witness, see id. ¶¶ 49-54; and (4) trial counsel's failure to call an expert witness to rebut the testimony of Dr. Sampson regarding PTSD, see id. ¶¶ 55-57. Savinon also claims he is entitled to relief on the ground that the trial court's "rendering of a missing witness charge violated [his] due process right to a fair trial under the Fourteenth Amendment." Id. ¶¶ 62-64. In addition, Savinon argues that he is entitled to habeas relief because the state courts denied his second CPL § 440.10 motion "without a hearing" where Camacho could "explain himself," id. ¶ 30, and, in any event, "[t]his Court should . . . hold an evidentiary hearing at which trial counsel and Camacho can testify," id. ¶ 58; accord id. ¶ 61.

After Savinon's amended petition and supporting papers were submitted, the case was removed from the suspense docket. Order, filed February 4, 2005 (Docket #15). Respondents thereafter filed their papers in opposition to the amended petition on March 15, 2005. See Supp. Aff.

By Order dated June 24, 2005, this Court requested that Savinon's trial counsel, Barry E. Schulman, submit an affidavit addressing Savinon's ineffective assistance of counsel claim. Order, dated June 24, 2005 (Docket #18) ("June 24 Order"), at 1. Specifically, the Court requested that Schulman's affidavit include "a discussion of his reasons for choosing not to

subpoena Camacho or request[ing] a material witness warrant and any information he may have had regarding the alleged intimidation by investigators from the District Attorney's Office." <u>Id.</u> at 1-2 (citation and internal quotation marks omitted).  On July 14, 2005, Schulman submitted an affidavit addressing these issues.  <u>See</u> Affidavit of Trial Counsel Regarding Petition for Writ of Habeas Corpus, 28 U.S.C. Section 2254, filed July 14, 2005 (Docket #19) ("Schulman Aff.").

The June 24 Order also granted the parties leave to respond to Schulman's affidavit through supplemental submissions.  <u>See</u> June 24 Order at 2.  Savinon's counsel submitted a declaration dated July 22, 2005, responding to Schulman's affidavit.  <u>See</u> Declaration, filed July 24, 2005 (Docket #20) ("Ruggiero Decl.").  The respondents submitted a supplemental declaration in opposition dated August 2, 2005.  <u>See</u> Supplemental Declaration in Opposition to Petition for a Writ of Habeas Corpus, filed August 2, 2005 (Docket #21) ("Supp. Decl.").

## II.  <u>APPLICABLE LEGAL PRINCIPLES</u>

### A.  <u>Law Governing Petitions for Habeas Corpus Under 28 U.S.C. § 2254</u>

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims . . . with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground."  <u>Sellan v.</u>

Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (internal quotation marks and citations omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited. See Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) (internal quotation marks omitted); accord Rosa v. McCray, 396 F.3d 210, 220 (2d Cir. 2005) ("This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision."). Moreover, a state court's determination of a factual issue is "presumed to be correct" and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In Williams v. Taylor, the Supreme Court held that a state court decision is "'contrary to'" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. 362, 405-06 (2000). Williams also held that habeas relief is available under the "'unreasonable application'" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been "objectively unreasonable." Id. at 409.

In addition, under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Errors of state law are not subject to federal habeas review. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). To be entitled to habeas relief a petitioner must demonstrate that the conviction resulted from a state court decision that violated federal law. See, e.g., id. at 68.

B. Exhaustion

Before a federal court may consider the merits of a habeas claim, a petitioner is first required to exhaust his available state court remedies. See 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."); accord Daye v. Attorney Gen. of New York, 696 F.2d 186, 190-91 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984). To exhaust a habeas claim, a petitioner is required to have presented that claim to each level of the state courts. See, e.g., Baldwin v. Reese, 541 U.S. 27, 29 (2004); see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (a habeas petitioner must invoke "one complete round of the State's established appellate review process"). The petitioner must also have fairly presented the federal nature of his claim to the state courts. See Baldwin, 541 U.S. at 29; Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam); Picard v. Connor, 404 U.S. 270, 275-276 (1971); Daye, 696 F.2d at 191. The exhaustion requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991).

C. Law Governing Ineffective Assistance of Counsel Claims

To show ineffective assistance of counsel, a petitioner must satisfy both prongs of the two-part test articulated in Strickland v. Washington, 466 U.S. 668 (1984). The Strickland test has been characterized as "rigorous" and "highly demanding." Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001) (internal quotation marks and citations omitted). To meet Strickland, a petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694; accord Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003); see also Massaro v. United States, 538 U.S. 500, 505 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").

In evaluating the first prong – whether counsel's performance fell below an objective standard of reasonableness – "'[j]udicial scrutiny . . . must be highly deferential'" and the petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689); see also Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (affording counsel a presumption of competence). In assessing whether an attorney's conduct was constitutionally deficient, "[t]he court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; accord Pavel, 261 F.3d at 216. Concerning the second prong – whether there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different – a court "requires some objective evidence other than defendant's assertions to establish prejudice." <u>Pham</u>, 317 F.3d at 182 (citing <u>United States v. Gordon</u>, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)). "A 'reasonable probability' in this context is one that 'undermine[s] confidence in the outcome.'" <u>Pavel</u>, 261 F.3d at 216 (quoting <u>Strickland</u>, 466 U.S. at 694) (alteration in original).

III.  <u>ANALYSIS</u>

A.  <u>Ineffective Assistance of Counsel Claims</u>

As noted, Savinon sets forth four different bases for his contention that trial counsel was ineffective.  <u>See</u> Am. Petition Decl. ¶¶ 32-39, 41-48, 49-54, 55-57.  Each of Savinon's contentions is addressed in turn.

1.  <u>Failure to Obtain Camacho's Testimony</u>

In the September 2004 § 440.10 motion, Savinon argued that his right to effective assistance of counsel was violated due to the failure of trial counsel "to subpoena . . . Camacho or to request a material witness order which would have forced [him] to appear in court and explain his unwillingness to testify."  440.10 Aff. II ¶¶ 35, 37, 39.  After this motion was denied by Justice Carro, <u>see</u> 440.10 Decision II at 5-6, the Appellate Division denied Savinon's application for leave to appeal.  <u>See</u> Leave Cert.  Savinon then raised this identical claim in his amended petition.  <u>See</u> Am. Petition Decl. ¶¶ 32, 38-39.[12]

---

[12]Respondent argued in response to the initial petition that the ineffective assistance of counsel claim had not been exhausted because it was not presented to the state courts "in federal constitutional terms."  Resp. Mem. at 23.  The argument was raised in federal constitutional terms in the September 2004 § 440.10 motion, however, <u>see</u> 440.10 Aff. II ¶¶ 1, 39, and respondent does not now argue otherwise.  <u>See</u> <u>generally</u> Supp. Aff.

In his decision rejecting this claim, Justice Carro found that because Camacho averred in his affidavit that "'nothing happened,' only talk" on the trip home, "the only logical inference to be drawn from these allegations is that during the ride to Manhattan [Camacho] observed no sexual intercourse." 440.10 Decision II at 4. The court stated that such testimony from Camacho would have directly contradicted Savinon's testimony that he and Jiminian engaged in sexual intercourse in the back of Savinon's automobile at Jiminian's insistence as proof of his commitment to her. Id. at 3-4. As a result, because "Camacho's testimony would have contradicted the defendant's testimony on a point crucial to the defense, and raised a sharp issue as to the defendant's credibility in addition to the clear credibility issue already presented by the complainant's testimony," the court concluded that "trial counsel had a strategic and legitimate reason for not pursuing the witness." Id. at 4-5.

In his affidavit, Camacho has averred that he told investigators "[t]here was no rape in the car in [sic] any moment," that "no rape took place," and that "nothing happened" in the car on December 4, 1998, between Savinon and Jiminian. Camacho Aff. ¶¶ I-II, IV-V, VIII. Camacho also averred that, after informing investigators from the District Attorney's Office that there was no rape, they told him he "better think twice about being a witness for Savinon," and that "they would make . . . lots of trouble for [him], and have [him] deported" if he were to testify for Savinon. Id. ¶ VI. Camacho contends, therefore, that he "couldn't help Savinon or be a witness for him because [he] was in fear of being deported or arrest[ed] by the investigators from [the] District Attorney [sic] office." Id. ¶ VII.

Based upon Camacho's affidavit, Savinon now argues that defense counsel was ineffective for failing "to call a witness who would have established [his] actual innocence of

43

the[] charges." Am. Petition Decl. ¶ 32. Savinon contends that trial counsel was ineffective in failing to subpoena Camacho and in not requesting a material witness order "which would have forced Camacho to appear in court and explain his unwillingness to testify"; defense counsel's failure to do so "exposed [him] to a devastating missing witness charge." Id.; accord id. ¶ 38. Savinon argues, therefore, that counsel's "dereliction of duty was so fundamental and so prejudicial to the defense that standing alone . . . it constitutes ineffective assistance under federal constitutional standards." Id. ¶ 32.

It is well-settled that the "decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987); accord United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992), cert. denied, 507 U.S. 1029 (1993). Thus, the "failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel." United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) (per curiam) (citations omitted), cert. denied, 538 U.S. 1021 (2003); accord Nersesian, 824 F.2d at 1321 (the decision not to call witnesses "fall[s] squarely within the ambit of trial strategy, and, if reasonably made, will not constitute a basis for an ineffective assistance claim").

While the choice whether or not to call a particular witness is a strategic choice that is "virtually unchallengeable," counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 690-91. Thus, although "counsel's decision as to whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional

representation," United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotation marks and citations omitted), cert. denied, 532 U.S. 1007 (2001), an attorney's failure to present available exculpatory evidence may be deficient "'unless some cogent tactical or other consideration justified it.'" Pavel, 261 F.3d at 220 (quoting Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992)); accord Eze v. Senkowski, 321 F.3d 110, 133 (2d Cir. 2003).

As it turns out, Schulman's reason for not calling Camacho was not the reason offered by Justice Carro: that is, a concern that Camacho's testimony would contradict the defense's theory of the case. Instead, Schulman states in his affidavit that he and Savinon "made extensive efforts to obtain an interview with Luis Camacho," but that they were unable to locate him during trial preparation despite their "repeated efforts." Schulman Aff. ¶ 9. According to Schulman, "in the middle of trial" he scheduled a meeting with Savinon "on a Sunday at his office to continue the trial preparation." Id. ¶ 10. At that meeting, Savinon "[u]nexpectedly" showed up "in the company of Luis Camacho." Id. Schulman thereafter "asked . . . Savinon to leave the room so he could meet with . . . Camacho privately." Id.

During the course of the meeting Camacho appeared "agitated and upset." Id. ¶ 11. Camacho informed Schulman "that he would only come to court if the prosecutor would grant him safe passage from deportation and 'other charges.'" Id. When Schulman asked Camacho what he meant by that, Camacho responded by stating that "at some point he had met with police or investigators on the case and that they were 'bad people.'" Id. Despite "entreaties" by Schulman, "Camacho refused to give further details." Id. Camacho stated "that he would call the next evening to see if [Schulman] could obtain safe passage for him." Id. ¶ 12. At that point, Camacho again made clear that "without safe passage . . . he would not come to court." Id.

Camacho then "abruptly left the office." Id. At the meeting, Camacho confirmed "that there had been no forcible sexual conduct or rape in the car." Id. ¶ 11.

Schulman "believes that he learned during the investigation of the case" that Camacho had previously been deported following a drug conviction, and that it was possible that Camacho's appearance in court "would have . . . exposed [him] to a sentence of up to 20 years in prison" based upon his illegal reentry to this country. Id. ¶ 16. Thus, Schulman avers that "Camacho made clear that he believed he would receive substantial jail time if [he] appeared in court . . . without some form of legal protection." Id.

According to Schulman, "[e]ven if [he] had been inclined to issue a subpoena" during his meeting with Camacho, "there would ha[ve] been no opportunity to prepare one." Id. ¶ 13. Schulman states that "[i]t was difficult enough to conduct an interview without Camacho running away," and because he "was not expecting Camacho that day," there was "no support staff to obtain the proper form nor complete the same." Id. In any event, Schulman avers that obtaining a subpoena would have been a "meaningless exercise" since Camacho's illegal reentry after deportation "could have resulted in a substantial jail sentence and deportation." Id. ¶ 15.

Schulman also avers that it is "ludicrous to suggest that [he] could have obtained a material witness warrant under the circumstances." Id. ¶ 14. According to Schulman, a "material witness order would result in the appointment or retention of a defense lawyer," and any "effective lawyer" would have recommended to Camacho that he "assert[] . . . his fifth amendment right to silence" in order to avoid prosecution and deportation. Id. Thus, Schulman states that he did not subpoena Camacho or obtain a material witness order because he believed that Camacho would have invoked his Fifth Amendment rights and refused to testify in light of

the fact that he faced both a substantial jail sentence and deportation based upon his illegal reentry to this country. See Schulman Aff. ¶¶ 14-16.

Savinon was given an opportunity to respond to Schulman's affidavit. He did not submit any further information from Camacho, however, on any of the matters raised by Schulman – including whether in fact he would have testified in this matter had he been served with a subpoena or had he been arrested on a material witness warrant.

Savinon is unable to make out a claim of ineffective assistance of counsel because, in the absence of any evidence that Camacho actually would have testified had he been subpoenaed or arrested on a warrant, Savinon cannot prove any prejudice. To succeed on his claim, Savinon must show that there is "a reasonable probability" that the result of his trial "would have been different" had Camacho been served with a subpoena or material witness warrant. Strickland, 466 U.S. at 694. Savinon has not made that showing here. In the context of an uncalled witness, courts have held that, "[t]o affirmatively prove prejudice, a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial." Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990) (emphasis added) (citing Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir.1985)); accord Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002); Stewart v. Nix, 31 F.3d 741, 744 (8th Cir. 1994); Croney v. Scully, 1988 WL 69766, at *2 (E.D.N.Y. June 13, 1988); see also Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981) (denying ineffective assistance claim where petitioner did not offer "any facts to support his allegation that [the witness] would have testified at all even if called"). Not only does Camacho's affidavit fail to state that he would have testified at trial had he been called upon to do so, it actually states the precise opposite. He avers:

"I couldn't help Savinon or be a witness for him because I was in fear of being deported or arrest[ed] by the investigators from [the] District Attorney [sic] office." Camacho Aff. ¶ VII. This statement is in accord with Schulman's own affidavit, which recounts that Camacho told him that "he would only come to the court if the prosecutor would grant him safe passage from deportation and 'other charges.'" Schulman Aff. ¶ 11. Obviously, there is no reason to believe that the prosecutor would have granted him such "safe passage." Thus, in the absence of evidence that Camacho would have been willing to testify, Savinon cannot prove that he was prejudiced by Schulman's failure to issue a subpoena or a material witness warrant.

Savinon also argues that "trial counsel was ineffective under the Strickland . . . test because he failed to seek a remedy from the trial judge for the state's intimidation of a critical witness for the defense." Am. Petition ¶ 21; accord Ruggiero Decl. ¶ 9. Savinon contends that if investigators "had threatened Camacho that they would deport him if he testified for Savinon, it was trial counsel's obligation to get to the bottom of such witness intimidation, and to subpoena the investigators to court as well." Ruggiero Decl. ¶ 8. Savinon claims that the Second Circuit's decision in Hemstreet v. Greiner, 367 F.3d 135 (2d Cir. 2004), vacated, 378 F.3d 265 (2d Cir. 2004) supports his contentions on this issue. See Am. Petition ¶ 21; Ruggiero Decl. ¶ 9. In Hemstreet, the petitioner's counsel learned that detectives had visited a witness's family and informed them that they were in for "a lot of trouble" if the witness testified, but took no action other than informing the court of the allegation. 367 F.3d at 137. The court found that trial counsel's "failure to seek relief for the [detective's] intimidation of . . . a crucial defense witness . . . was so deficient and prejudicial as to deprive [petitioner] of a fair trial under

Strickland." Id. at 138, 140; but see Hemstreet II, 378 F.3d at 269 (vacating the earlier decision after the witness testified she lied in her earlier affidavit that detectives intimidated her).

Hemstreet is irrelevant for several reasons. First, Schulman has pointed to a tactical reason that supports his decision not to present Camacho's potentially exculpatory testimony: namely, that Camacho would have invoked his rights under the Fifth Amendment and refused to testify, thus making a subpoena futile. See Schulman Aff. ¶¶ 14-16. Second, and more significantly, there is no evidence in the record establishing that Schulman was aware of the intimidation now being alleged by Camacho. Camacho informed Schulman at their meeting only that "at some point he had met with police or investigators on the case, and that they were 'bad people.'" Schulman Aff. ¶ 11. Camacho was unwilling to disclose any further information at that time, id., and Savinon, who apparently has access to Camacho now, has offered nothing to this Court from Camacho suggesting otherwise. Thus, the record reflects that the first time Camacho disclosed the circumstances surrounding the alleged intimidation was May 2004, nearly three years after Savinon was sentenced. See Camacho Aff. ¶¶ VI-VII. Obviously, Schulman cannot be faulted for failing to seek a remedy from the court for alleged conduct on the part of investigators that he was entirely unaware of at the time of trial.[13]

_____

[13]In addition, unlike Hemstreet, respondent here has pointed to specific information in the record that rebuts Camacho's assertions concerning the alleged intimidation. See Supp. Aff. ¶ 14. Detective Garrido testified at trial that he never interviewed Camacho. (Tr. 109). Indeed, papers submitted in opposition to the September 2004 § 440.10 motion state that Detective Garrido was the "only law enforcement personnel" to work on this case and that he never had a conversation with Camacho either in person or by telephone. See Sept. 2004 § 440.10 Opp. at 3. Moreover, contrary to Camacho's averment that "investigators from [the] District Attorney [sic] office" interviewed him, see Camacho Aff. ¶ I, respondents have indicated in their opposition papers submitted in state court that "[n]o 'investigators' were ever used from the District Attorney's Office in connection with this case." Sept. 2004 § 440.10 Opp. at 3. Furthermore, respondents assert that, because Jiminian was Detective Garrido's sole "source of information"

While Savinon argues that Schulman had an obligation "to find out what transpired between Camacho and the investigators before allowing this key exculpating witness to go by the wayside," Schulman Aff. ¶ 9, Camacho's mere statement to Schulman that the investigators were "bad people" was insufficient to trigger this duty – particularly given that Camacho departed from Schulman's office so abruptly. In addition, there was a logical explanation for Camacho's reluctance to testify that had nothing to do with any purported misconduct by the prosecution: namely, that Camacho was an illegal alien and faced imprisonment if his presence in the country was made known to law enforcement personnel. Cf. Wiggins v. Smith, 539 U.S. 510, 527 (2003) (in determining the "reasonableness of an attorney's investigation" the court must consider whether the information known by counsel "would lead a reasonable attorney to investigate further"); accord Gersten v. Senkowski, 299 F. Supp. 2d 84, 100 (E.D.N.Y. 2004); see also Wilson v. Henry, 1998 WL 227150, at *6 (N.D. Cal. Apr. 27, 1998) ("Because counsel's decisions are to be accorded a great deal of deference, and because petitioner has not adequately demonstrated that the facts . . . should have triggered counsel's duty to investigate, counsel was not ineffective when he determined that investigation into the circumstances and surroundings of the shooting would be fruitless.").

2. Ineffectiveness Claims Relating to Jiminian's Prior Abortions

On direct appeal, Savinon argued that trial counsel was ineffective for failing to make a written proffer to the trial court concerning the evidence pertaining to Jiminian's three prior abortions, and then mentioning this fact in his opening statement, thereby "result[ing] in a

---

concerning Camacho, Detective Garrido had limited information concerning Camacho's identity, and the information he did have "provided no leads." Id.

mistrial and depriv[ing] th[e] defendant of the jury he chose." Pet. App. Div. Br. at 55. Savinon also argued on direct appeal that trial counsel was ineffective for not seeking "permission" from the trial court to cross-examine Jiminian concerning her prior abortions "after the People introduced evidence of her depression and the reason therefor." See id. at 55-56. The Appellate Division, in affirming Savinon's conviction, stated that Savinon "failed to present an adequate record" with respect to the ineffective assistance claim, but nevertheless found that "to the extent the present record permits review, we find that defendant received meaningful representation." Savinon, 293 A.D.2d at 414. Savinon then raised these same claims in his brief to the Court of Appeals, see Pet. Ct. App. Br. at 55-56, which found the claims to be "without merit." Savinon, 100 N.Y.2d at 201.

In the September 2002 § 440.10 motion, Savinon argued that trial counsel was ineffective for, inter alia, delivering an opening statement referring to Jiminian's "prior sexual relationships" and her having had "three abortions," statements which ultimately resulted in a mistrial. 440.10 Aff. I at 13-15. Although Justice Carro found this claim was "properly raised" in a CPL § 440.10 motion, he rejected it. 440.10 Decision I at 3. Savinon did not seek leave to appeal Justice Carro's decision denying the motion.

In his amended petition, Savinon again contends that trial counsel was ineffective because he caused a mistrial by referring to Jiminian's three prior abortions in his opening statement during the first proceeding, see Am. Petition Decl. ¶¶ 41-48, and because he failed to cross-examine Jiminian concerning her three prior abortions. See id. ¶¶ 45-48. Respondents now argue that these claims are unexhausted because they were not presented to the state courts "in federal constitutional terms." Resp. Mem. at 23. Rather than determine whether the state courts

51

were alerted to the federal constitutional nature of these claims, this Court will exercise its option to deny these claims on the merits. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

a. Reference to Abortions Resulting in a Mistrial. Counsel's reference to Jiminian's three prior abortions in his opening statement does not entitle Savinon to relief for two reasons.

First, Savinon has failed to overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell, 535 U.S. at 698 (quoting Strickland, 466 U.S. at 689). During the first proceeding, defense counsel argued in favor of permitting the reference to Jiminian's abortions by connecting the prior abortions to Jiminian's state of mind. (See I Tr. 33-34, 42). At the time that the court granted the prosecution's request for a mistrial, the court's ruling was not that all testimony pertaining to Jiminian's "prior sexual conduct" was irrelevant, but rather, that such testimony could only be presented after a formal proffer to the court. (See I Tr. 39); see also N.Y. C.P.L. § 60.42 ("Evidence of a victim's sexual conduct shall not be admissible in a prosecution for an offense . . . unless such evidence . . . (5) is determined by the court after an offer of proof by the accused outside the hearing of the jury . . . to be relevant and admissible in the interests of justice."). Defense counsel explained that he referred to the abortions in his opening statement, even though he did not make a formal proffer to the court, since he thought that the prosecutor "opened the door" on this issue by referring to Jiminian's depression in her opening statement. (See I Tr. 33, 42); see also People v. Jovanovic, 263 A.D.2d 182, 197 (1st Dep't 1999) (stating that the "interests of justice" exception to the rape-shield law "was included in order to give courts discretion to admit what was otherwise

excludable under the statute . . . where it is determined that the evidence is relevant") (citation omitted).

In fact, Savinon claimed on appeal that, under CPL § 60.42(5), the trial court erred in granting the prosecution's request for a mistrial because counsel's reference to the abortions was offered to explain proposed testimony concerning Jiminian's depression. See Pet. App. Div. Br. at 53-54. Savinon's argument on this point, therefore, amounts to nothing more than a complaint that defense counsel's strategy proved to be unsuccessful. That fact, however, does not entitle Savinon to habeas relief. See Henry v. Poole, 409 F.3d 48, 58 (2d Cir. 2005) (in applying the Strickland standard, "courts should not confuse true ineffectiveness with losing trial tactics or unsuccessful attempts to advance the best possible defense"); Lopez v. Greiner, 323 F. Supp. 2d 456, 480 (S.D.N.Y. 2004) (trial counsel not ineffective where "the record as a whole" demonstrates that counsel "pursued a coherent, if ultimately unsuccessful, defense strategy"); Johnson v. United States, 307 F. Supp. 2d 380, 391 (D. Conn. 2003) ("[A]cts or omissions of counsel that might be considered 'sound trial strategy' do not constitute ineffective assistance, even if they turn out to be unsuccessful.") (quoting Best, 219 F.3d at 201).

Second, Savinon fails to establish the second prong of the Strickland test. Savinon has articulated no prejudice that he suffered as a result of his attorney's alleged error other than to assert that he was not tried by "the jury of his choice." Am. Petition Decl. ¶ 44. But Savinon in fact was tried by a "jury he chose": namely, the jury in his second trial. Savinon's reliance on case law relating to double jeopardy claims, see Am. Petition Decl. ¶ 44 (citing Illinois v. Sommerville, 410 U.S. 458 (1973); Wade v. Hunter, 336 U.S. 684, 689 (1949)), is irrelevant. Savinon has no double jeopardy claim. He cannot meet the second prong of the Strickland test

because he cannot demonstrate that there is "a reasonable probability" that the result of his trial "would have been different" had he been tried by the first jury rather than by the second jury. Strickland, 466 U.S. at 694.

b. Failure to Cross-Examine Jiminian Concerning her Prior Abortions. Savinon argues that, because the trial court's decision to declare a mistrial "did not completely close the door to the use of the abortions in cross-examining the complainant," counsel was ineffective because he "apparently did not investigate this issue and did not cross-examine the complainant on this subject." Am. Petition Decl. ¶ 45. Savinon contends that trial counsel was ineffective because he "failed to properly set the ground work for cross-examination of the complaining witness [concerning her prior abortions] with the permission of the court and within the confines of the law." Id. ¶ 48. According to Savinon, had trial counsel "complied with the procedural requirements of the rape shield law" he would have been able to use this evidence in cross-examining Jiminian in order to show a side of her character that was far different from the "religious and pious person" depicted by the prosecutor. See id. ¶¶ 46-47.

It is well-settled that decisions "whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." Nersesian, 824 F.2d at 1321; accord Eze, 321 F.3d at 127 ("'The conduct of examination and cross-examination is entrusted to the judgment of the lawyer.'") (quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998)). The Supreme Court has held that, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (citing Strickland, 466 U.S. at 690). "That presumption has particular force where a petitioner bases his ineffective-assistance claim solely

on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic move.'" Id. at 5-6 (quoting Massaro, 538 U.S. at 505).

Here, Savinon is unable to overcome this presumption. Savinon testified extensively concerning Jiminian's sexual aggressiveness. This testimony, at a minimum, assisted the jury in determining the veracity and reliability of the state's evidence concerning Jiminian's character. Defense counsel's decision to discredit testimony presented in the state's case concerning Jiminian's character through Savinon's testimony – rather than through impeaching her on the issue of her prior abortions – is the type of strategic decision that "fell within the wide range of acceptable professional assistance." Dunham, 313 F.3d at 732. In any event, the record indicates that counsel cross-examined Jiminian on a number of issues that related to her character. For example, Jiminian was cross-examined extensively concerning the facts and circumstances surrounding her prior conviction on narcotics and drug charges. (See Jiminian: Tr. 180-92). Counsel also elicited testimony from Jiminian concerning her status in this country as an illegal immigrant (Jiminian: Tr. 192), her bouts with depression, her attempts to commit suicide (see Jiminian: Tr. 197-201), and the casual nature of her sexual relationship with Savinon (see Jiminian: Tr. 212-13, 216-219). Indeed, a decision to raise Jiminian's prior abortions might have risked appearing callous to a jury and would have been of minimal probative value. See Eze, 321 F.3d at 132 (petitioner's contention that trial counsel ineffectively cross-examined a witness rejected in light of the "significant deference we accord a trial counsel's decision how to conduct cross-examination and our refusal to use perfect hindsight to criticize unsuccessful trial strategies" where trial counsel cross-examined the witness on matters that served to undermine

her testimony) (citing cases); <u>Eisen</u>, 974 F.2d at 265 (no ineffective assistance based on failure to adequately impeach government witnesses where defense counsel vigorously cross-examined witnesses and could have reasonably concluded that further questioning on relatively unimportant matters would confuse or fatigue the jury).

      3.  <u>Failure to Challenge Qualifications and Testimony of the Prosecution's Expert</u>

On direct appeal, Savinon argued that trial counsel was ineffective for failing "to object to the qualifications of Dr. Sampson as an expert and to object to testimony given by Dr. Sampson." Pet. App. Div. Br. at 57. The Appellate Division rejected this claim, finding that an adequate record to review the issue did not exist and that, to the extent the record did permit review, Savinon was not denied effective assistance of counsel. <u>Savinon</u>, 293 A.D.2d at 414. Savinon then raised the identical issue before the Court of Appeals, <u>see</u> Pet. Ct. App. Br. at 57, and that court rejected the claim as "without merit." <u>Savinon</u>, 100 N.Y.2d at 201.

In the September 2002 § 440.10 motion, Savinon raised the identical issue. <u>See</u> 440.10 Aff. I at 19-20. Although Justice Carro found that the issue was "properly raised" in a § 440.10 motion, the claim was ultimately rejected by the court. 440.10 Decision I at 3. As noted, Savinon did not seek leave to appeal the decision denying the September 2002 § 440.10 motion.

In his amended petition, Savinon again contends that trial counsel was ineffective for failing to competently challenge the qualifications and testimony of Dr. Sampson. <u>See</u> Am. Petition Decl. ¶¶ 49-54. Respondents now argue that this claim is unexhausted because Savinon did not present it to the state courts on direct appeal in "federal constitutional terms." <u>See</u> Resp. Mem. at 23; <u>accord</u> <u>id.</u> at 34. It is not necessary to reach the question of whether the federal

nature of this claim was presented to the state courts, however, because this claim must be denied on the merits.  See 28 U.S.C. § 2254(b)(2).

Savinon argues that trial counsel's failure to object to Dr. Sampson's qualifications constituted ineffective assistance because "she was never qualified as a psychiatric witness equipped to testify about PSTD [sic]."  Am. Petition Decl. ¶ 54.  Savinon asserts that Dr. Sampson was not qualified to give an opinion on PTSD because she "had never been qualified as a psychiatric expert, had never examined the complainant, and had not even called or consulted with the complainant's treating physician from Columbia Presbyterian Hospital."  Id. ¶ 49. Because Dr. Sampson was only qualified as an "expert in forensic pathology and wound interpretation," id. ¶ 50 (quoting (Tr. 321)), Savinon contends that trial counsel was ineffective for not moving to preclude Dr. Sampson's testimony concerning PTSD, and that it was error to allow her to testify that the symptoms mentioned in Jiminian's testimony were consistent with PTSD.  Id. ¶¶ 50, 53.

At the time that the prosecutor asked that Dr. Sampson be qualified as an expert, the court asked defense counsel if he had any objection, and counsel responded by stating that he would reserve any objections for cross-examination.  (Tr. 321).  Defense counsel did object when Dr. Sampson began addressing what a person with PTSD would "feel," and the objection was overruled.  (Tr. 326).  Counsel also objected when the prosecutor asked Dr. Sampson, based upon her review of the medical records, what her opinion was "with respect to whether the symptoms described [in the records] are consistent with [PTSD]."  (Tr. 327-28).  This objection was overruled by the court and Dr. Sampson was permitted to opine that she "believe[d] that the symptoms that are described are consistent with [PTSD]."  (Tr. 328).

57

Thus, contrary to Savinon's assertions, counsel did in fact object to Dr. Sampson's testimony concerning PTSD, specifically her opinion that the symptoms described in Jiminian's medical records were "consistent" with PTSD. (Tr. 327-28). The fact that these objections were overruled and Dr. Sampson was permitted to testify concerning this subject does not establish that counsel was ineffective. See, e.g., Smalls v. McGinnis, 2004 WL 1774578, at *16 (S.D.N.Y. Aug. 10, 2004) (rejecting petitioner's claim of ineffective assistance "concerning the decisions his trial counsel made regarding," inter alia, objections at trial, because that was "part of the particular trial strategy adopted by his counsel, and counsel cannot be faulted for pursuing a trial strategy even if hindsight shows it was unsuccessful") (citation omitted).

Furthermore, after counsel made objections to Dr. Sampson's direct testimony, the record indicates that counsel elicited on cross examination of Dr. Sampson several important points helpful to Savinon that demonstrated the limits of Dr. Sampson's knowledge, expertise, and experience. For example, counsel attempted to call into question Dr. Sampson's qualifications by eliciting her testimony that her job as a Medical Examiner primarily involved examining "dead people," (Sampson: Tr. 328), and that she had virtually no experience with emergency room procedures dealing with a rape victim. (See Sampson: Tr. 331). Furthermore, counsel pointed out that the sole basis for Dr. Sampson's testimony was her review of Jiminian's medical records. (See Sampson: Tr. 329-338). Counsel also elicited from Dr. Sampson that she failed to even attempt to contact Jiminian's examining physician at Columbia Presbyterian. (Sampson: Tr. 338).

While Savinon contends that counsel should have moved to strike or preclude Dr. Sampson's testimony, see Am. Petition Decl. ¶ 53 & n.4, Savinon points to no basis on which a

meritorious motion could have been made to preclude this testimony. First, he provides no expert affidavit to this Court that would permit a finding that anything testified to by Dr. Sampson was inaccurate. Moreover, he provides no citation to New York law suggesting that a physician needs to be qualified in a particular specialty in order to testify regarding any aspect of that specialty. Indeed, it appears New York law is to the contrary. See Julien v. Physician's Hosp., 231 A.D.2d 678, 680 (2nd Dep't 1996) ("a physician need not be a specialist in a particular field in order to be considered a medical expert") (quoting Humphrey v. Jewish Hosp. & Med. Ctr., 172 A.D.2d 494, 567 (2nd Dep't 1991)); see also Fuller v. Preis, 35 N.Y.2d 425, 431 (1974) ("That the neurologist did not practice the closely related specialty of psychiatry was no bar to his testifying as a medical expert.") (citing People v. Rice, 159 N.Y. 400, 410 (1899); Richardson, Evidence [10th ed.], § 368); accord Darby v. Cohen, 421 N.Y.S.2d 337, 338 (N.Y. Sup. Ct. 1979) (interpreting Fuller to stand for the proposition that "a physician licensed to practice medicine may be qualified as an expert in any branch of medicine despite the fact that he is not a specialist in that branch and the fact that he was not a specialist should only go to the weight of his testimony and not to its admissibility.").

### 4. Failure to Call Expert Witness in Rebuttal

In the September 2002 § 440.10 motion, Savinon argued that trial counsel was ineffective for failing "to secure independent medical testimony" to rebut Dr. Sampson's medical opinion. 440.10 Aff. I at 20. Justice Carro denied this motion, see 440.10 Decision I at 7, and Savinon failed to appeal Justice Carro's decision. Savinon did not raise this claim on direct appeal. Savinon raised a claim identical to that raised in his September 2002 § 440.10 motion in his amended petition. See Am. Petition Decl. ¶¶ 55-57. As with Savinon's other claims of

ineffective assistance, respondents argue that this claim is unexhausted.  See Resp. Mem. at 23;

accord id. at 34.  Regardless of whether or not this claim is exhausted, however, it must be

denied on the merits.  See 28 U.S.C. § 2254(b)(2).

Courts have held that "the decision whether or not to call an expert witness generally falls

within the wide sphere of strategic choices for which counsel will not be second-guessed on

habeas review."  Stapleton v. Greiner, 2000 WL 1207259, at *16 (E.D.N.Y. July 10, 2000)

(citing United States v. Kirsch, 54 F.3d 1062, 1072 (2d Cir.), cert. denied, 516 U.S. 927 (1995));

accord James v. United States, 2002 WL 1023146, at *16 (S.D.N.Y. May 20, 2002) (Report and

Recommendation), adopted by Order, filed August 20, 2002, in 97 Cr. 185 (LAK) (S.D.N.Y.);

see also Murden v. Artuz, 253 F. Supp. 2d 376, 389 (E.D.N.Y. 2001) ("[I]n general, whether or

not to hire an expert is the type of strategic choice by counsel that may not be second-guessed on

habeas corpus review.").  Nevertheless, "[w]here counsel fails to make a reasonable investigation

that is reasonably necessary to the defense, a court must conclude that the decision not to call an

expert cannot have been based on strategic considerations and will thus be subject to review

under Strickland's prejudice prong."  Benjamin v. Greiner, 296 F. Supp. 2d 321, 330 (E.D.N.Y.

2003) (citing cases); accord Ciaprazi v. Senkowski, 2003 WL 23199520, at *5 (E.D.N.Y. Dec. 5,

2003).

In his amended petition, Savinon argues that trial counsel was ineffective for "failing to

call an expert witness to challenge the testimony of Doctor Sampson about PTSD."  Am. Petition

Decl. ¶ 55.  Savinon contends that Dr. Sampson's testimony "could have been challenged by a

truly qualified psychiatric witness on behalf of the defense" and that it was "inexcusable not to

call a psychiatric expert witness on behalf of the defense to explain to the jury the multiple and

complex roots of PTSD." Id. ¶ 56. This claim must be rejected, however, as it rests only on

speculation. Savinon has provided no affidavit or other basis on which to conclude that there

existed a witness who could have offered relevant and probative evidence contrary to the

testimony offered by Dr. Sampson. Thus, the decision of trial counsel not to call an expert

"cannot be considered objectively unreasonable" given that Savinon "has only presented his

vague hope that another expert might have reached a different result than the government

expert." Leaks v. United States, 841 F. Supp. 536, 545 (S.D.N.Y. 1994) (footnote omitted),

aff'd, 47 F.3d 1157, cert. denied, 516 U.S. 926 (1995). see also United States v. Morales,

1 F. Supp. 2d 389, 393 (S.D.N.Y. 1998) (rejecting claim that counsel was ineffective where

defendant "made no showing" that trial counsel's decision not to call "unidentified . . . witnesses

was unreasonable in light of the circumstances of th[e] case"). For the same reasons, Savinon is

also unable to satisfy the prejudice prong of the Strickland test since he has neither alleged nor

presented objective evidence to support a finding that a defense expert would have provided

testimony different from that offered by Dr. Sampson. See James, 2002 WL 1023146, at *16

(rejecting petitioner's claim that trial counsel was ineffective in failing to obtain expert testimony

where petitioner "provided no reason to believe that an . . . expert hired by the defense would

have offered any exculpatory testimony or indeed any testimony that differed from the

Government expert"); Murden, 253 F. Supp. 2d at 389 (petitioner failed to show prejudice based

on attorney's decision not to hire an expert where the petitioner did not "come forward with

affidavits or other admissible evidence showing that there is an expert witness who would have

testified" concerning issues that would have raised a reasonable doubt as to petitioner's guilt);

Leaks, 841 F. Supp. at 545 (rejecting petitioner's claim that trial counsel was ineffective for failing to call a handwriting expert because his argument was "purely speculative").

B. Error in Missing Witness Charge to the Jury

Savinon contends that he is entitled to relief on the ground that the trial court's "rendering of a missing witness charge violated [his] due process right to a fair trial under the Fourteenth Amendment." Am. Petition Decl. ¶¶ 62-64. Respondents argue that Savinon failed to exhaust this claim in state court because, "[a]lthough petitioner argued in his Appellate Division brief that the trial court erroneously delivered a missing witness charge," this claim was not presented to the state courts in "federal constitutional terms." Resp. Mem. at 23, 26. This Court need not address whether this claim was exhausted in the state courts because it fails on the merits. See 28 U.S.C. § 2254(b)(2).

Here, both the Appellate Division and the Court of Appeals denied on the merits Savinon's claim concerning the missing witness instruction. See Savinon, 293 A.D.2d at 413; Savinon, 100 N.Y.2d at 199-201. Accordingly, the deferential § 2254(d) standard applies.

"The adequacy of a jury charge is ordinarily a matter of state law." Hoover v. Senkowski, 2003 WL 21313726, at *9 (E.D.N.Y. May 24, 2003). "'In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.'" Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)). "Where an error in a jury instruction is alleged, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed

to the defendant by the Fourteenth Amendment." Id. (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973) (internal quotations omitted). In other words, to warrant habeas relief, the petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at 147.

Savinon argues that he is entitled to habeas relief because, when "[p]resented with the evidence before it, the trial court at most should have rendered an even-handed 'uncalled witness' charge, and should have barred the prosecutor from making any reference to a missing witness in her summation." Am. Petition Decl. ¶ 64 (citing cases). According to Savinon, it becomes clear that his right to Due Process under the Fourteenth Amendment was violated when the trial court's missing witness charge is "considered in conjunction with the prosecutor's summation comments" on that issue. See id.

In this instance, the trial court instructed the jury that the law permitted jurors to "infer," if it was "proper to do so," that if Camacho would have testified on Savinon's behalf his testimony "would not have supported the testimony of the defendant." (Tr. 698). The court specifically instructed the jury that it could not make this inference unless it was "satisfied that Flaco was under the control of the defendant and was available to be called by the defendant." (Tr. 698). The court also instructed the jury that it could "consider the explanation offered during the trial by the defendant for the failure to call Flaco" in making this determination. (Tr. 698). In considering Savinon's explanation for why Flaco failed to testify, the trial court made clear that the jury was obligated not to draw a negative inference if Savinon's testimony or "all the other evidence in the case" satisfied the jury that Flaco was not under his control or "was unavailable to be called as a witness" by Savinon. (Tr. 698-699).

Initially, the Court must determine whether the challenged instruction created a mandatory presumption or only authorized a permissive inference. In Francis v. Franklin, 471 U.S. 307, 314 (1985), the Supreme Court explained the distinction between mandatory presumptions and permissive inferences by stating:

> A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion.

accord United States v. Gotchis, 803 F.2d 74, 80 (2d Cir. 1986); see also County Court of Ulster County, N.Y. v. Allen, 442 U.S. 140, 157 (1979) (stating that a permissive inference "allows -- but does not require -- the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant") (citing Barnes v. United States, 412 U.S. 837, 840 n.3 (1973)).

Here, the missing witness instruction at issue did not "require" the jury to make any specific findings. Rather, by stating that the jury was "permitted" to infer certain facts if it found it "proper to do so," (see Tr. 698), the court simply allowed the jury to draw an inference after considering the circumstances surrounding Savinon's efforts to obtain Camacho's testimony.

The Supreme Court has stated that "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." Francis, 471 U.S. at 314-15 (citing Ulster County, 442 U.S. at 157-63); see also Government of Virgin Islands v. Parrilla, 7 F.3d 1097, 1101 (3d Cir. 1993) (an as-applied challenge to a permissive inference can succeed "if there is no rational way the trier of fact could have made the connection permitted by the inference") (citing Ulster County,

442 U.S. at 157); Hill v. Maloney, 927 F.2d 646, 649 (1st Cir. 1990) ("The use of a permissive presumption is constitutional so long as there is a 'rational connection' between the predicate and presumed facts.") (citing cases). In fact, the Second Circuit has specifically held that

> there is no deprivation of a defendant's constitutional rights by permitting the jury to draw an adverse inference against him for his failure to call an available material witness. Such an instruction neither violates the defendant's right to have the prosecution bear the burden of proof as to all elements of the crime, nor rests on an unreasonable conclusion from the facts.

United States v. Caccia, 122 F.3d 136, 140 (2d Cir. 1997) (citing Francis, 471 U.S. at 314); see also Niziolek v. Ashe, 694 F.2d 282, 292 (1st Cir. 1982) (stating that the trial court's use of a missing witness instruction did not "implicate any constitutional rights of petitioner" where the "inference mentioned in the instruction was wholly permissive"); Martinez v. Spencer, 195 F. Supp. 2d 284, 308 (D. Mass. 2002) ("The use of a missing witness instruction does not implicate any constitutional rights of a petitioner or shift the burden of proof.") (citing cases).

Here, the dispute centers on whether Camacho was within the "control" of or "available" to Savinon. On the issue of control, Savinon testified that he and Camacho were friends who had known each other "for a long time." (Savinon: Tr. 455, 457). He also testified that he had extended credit to Camacho in the past and had also loaned him his Lexus on occasion to visit clients. (See Savinon: Tr. 391, 454, 456). Jiminian too had testified that she had seen Camacho drive Savinon's car "many times," and that Savinon and Camacho "looked like" they were friends. (Jiminian: Tr. 80).

On the issue of availability, the evidence before the jury was that Savinon, after making some significant efforts, had been able to make contact with Camacho. (Savinon: Tr. 462). In fact, Savinon arranged for Camacho to come to defense counsel's office on a Sunday in the

middle of trial. (Savinon: Tr. 462-63). While Savinon testified that Camacho was not served with a subpoena at this meeting, (Savinon: Tr. 539), these facts nonetheless would be sufficient to justify a jury's conclusion that Camacho was "available" as a witness.

Of course, there were additional facts in the record before the jury suggesting a lack of control and availability. Specifically, Savinon testified to the jury that Camacho told him that he "didn't want to come" to court because he had "legal problems," "had been deported," and "was illegal here." (Savinon: Tr. 537). The question thus becomes whether this additional testimony renders the conclusion that Camacho was available and under Savinon's control to be lacking in "reason and common sense." Francis, 471 U.S. at 315.

While it is a close question, this Court cannot say that the New York courts' decision that the instruction was proper represented an unreasonable application of Supreme Court law. The instruction explicitly left to the jury the question of determining whether Camacho was available to Savinon and under his control. Certainly, Jiminian's testimony coupled with Savinon's testimony regarding their relationship, and the fact that Camacho had come to Savinon's attorney's office, would be sufficient for "reason and common sense" to justify a jury's conclusion that Camacho was available to Savinon and under his control. While there was contradictory testimony from Savinon, the jury might well have chosen to discredit his testimony – particularly given that they had obviously discredited central elements of Savinon's testimony.

Looking at the matter in hindsight, of course, we now have much stronger corroboration of Camacho's lack of availability and Savinon's lack of control – in particular through Camacho's affidavit. But this evidence was not before the jury or the trial court. Judging the federal constitutional issue on the basis of "the proven facts before the jury," Francis, 471 U.S.

66

at 315, "reason and common sense" would permit a finding of availability and control.  In any event, the state court decisions rejecting this claim did not involve an "unreasonable application of . . . clearly established Federal law . . . as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).[14]

### C. Savinon's Claims Regarding the Denial of a Hearing

#### 1. Failure to Hold Hearings on § 440.10 Motions

Savinon claims that the trial court erred in denying his § 440.10 motions "without a hearing at which Camacho could have explained himself."  Am. Petition Decl. ¶ 30.  According to Savinon, the state court's decision not to order a hearing entitles him to habeas relief "because Camacho's affidavit establishes that no rape occurred and that [he] is innocent of the[] charges."  Id.  Savinon contends, therefore, that the § 440.10 court deprived him of "a fair hearing to

---

[14]Savinon also raises the fact that the prosecutor discussed the missing witness issue in summation.  Am. Petition Decl. ¶¶ 62 & n.5, 64; (see Tr. 677-78).  While defense counsel argued to the jury that Savinon was powerless to produce Camacho to testify, (Tr. 637-38), the prosecutor argued defendant could have gotten a "warrant for this guy's arrest," and consequently, the jury could "infer" Camacho's "testimony would be damaging to defendant." (Tr. 677-78).  Once it is determined that the missing witness instruction was proper, however, there is no great significance to the prosecution's argument.  The trial court instructed the jury that it was "not bound to accept the arguments of the respective attorneys."  (Tr. 686).  It also instructed the jury on more than one occasion that "regardless of what counsel on either side of the case may have said about the facts," it was the jurors' "own recollection, understanding, and evaluation of the facts presented by the evidence at . . . trial that controls."  (Tr. 685; accord Tr. 621-22).  To the extent that Savinon is making a sub silentio argument that the prosecution engaged in burden-shifting, that argument must be rejected.  The prosecutor's comments do not suggest as much, and the trial court told the jury, directly after the prosecutor made the relevant summation comments and defendant's objection thereto, that the judge would instruct the jury on Camacho's absence from the trial.  See Tr. 678.  Furthermore, the trial court's later instructions – that defendant was presumed innocent and the burden of proof was on the prosecutor – tempered "any risk that the missing witness charge" or the prosecutor's comments in summation could be "misunderstood by the jury" as indicating that Savinon had an obligation to produce Camacho as a witness.  See Caccia, 122 F.3d at 140.

explore his Sixth Amendment and Due Process claims." Id. ¶ 31. Savinon also apparently contends that he is entitled to relief because the § 440.10 court did not obtain an affidavit from Schulman "explaining" Schulman's actions and instead speculated "that Schulman did not call Camacho because he thought he would contradict or undermine Savinon's testimony." Ruggiero Decl. ¶ 15. Savinon, however, offers no explanation of why he did not seek an affidavit from Schulman.

"[P]rocedural errors in state post-conviction proceedings are not cognizable on federal habeas review." Guzman v. Couture, 2003 WL 165746, at *13 (S.D.N.Y. Jan. 22, 2003). "All the circuits that have considered the issue, except one, have held that federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." Id. (quoting Franza v. Stinson, 58 F. Supp. 2d 124, 151 (S.D.N.Y. 1999)) (internal quotations omitted) (collecting cases); accord Jones v. Duncan, 162 F. Supp. 2d 204, 217-18 & n.21 (S.D.N.Y. 2001) (collecting cases). The only Circuit that appears to hold to the contrary is the First Circuit. See Dickerson v. Walsh, 750 F.2d 150, 152-54 (1st Cir. 1984) (holding that "petitioner's claim is the proper subject of a habeas corpus petition" where the petitioner argued that the state's post-conviction review procedure violated his right to equal protection). Although the Second Circuit has not explicitly addressed this issue, district courts in this Circuit have repeatedly followed the majority rule. See Guzman, 2003 WL 165746, at *14 (rejecting petitioner's assertion that "the failure to hold a hearing on his CPL §§ 440.10 and 330.30 newly discovered evidence motions violated due process" since such a claim "is not cognizable on federal habeas review") (citing Jones, 162 F. Supp. 2d at 217-18); Calderon v. Keane, 2002 WL 1205745, at *6 (S.D.N.Y. Feb. 21, 2002) (Report and Recommendation) ("Claims that focus only on the state's post-conviction

remedy and not on the conviction which is the basis for [petitioner's] incarceration are not cognizable on habeas review."), adopted by 2003 WL 22097504 (S.D.N.Y. Sep. 9, 2003), aff'd, 115 Fed.Appx. 455 (2d Cir. 2004); Diaz v. Greiner, 110 F. Supp. 2d 225, 236 (S.D.N.Y. 2000) ("Petitioner's unsupported assertion that the trial court denied his (third) CPL § 440.10 motion without a hearing violated due process is not cognizable on federal habeas review."); see also Sparman v. Edwards, 26 F. Supp. 2d 450, 468 n.13 (E.D.N.Y. 1997) ("[T]he weight of authority holds that in habeas corpus proceedings federal courts do not have jurisdiction to review state court denials of motions for a new trial.") (citing cases), aff'd, 154 F.3d 51 (2d Cir. 1997).

This Court is in agreement with the majority position. Therefore, Savinon's claim that he is entitled to habeas relief because of the § 440.10 court's failure to hold a hearing or request an affidavit from Schulman is not cognizable on federal habeas review and must be rejected.

### 2. Whether Savinon is Entitled to a Hearing in this Court

Savinon contends that "[t]his Court should . . . hold an evidentiary hearing at which trial counsel and Camacho can testify" because of the state court's failure to do so. Am. Petition Decl. ¶¶ 31, 58. In papers submitted before the Schulman affidavit was received, Savinon contended that "[t]his case is plainly one that calls for counsel's further explanation because, on the record as it now exists, counsel has failed to explain his omissions, and the record does not sufficiently demonstrate that they were defensible as part of a legitimate trial strategy." Id. ¶ 61; accord id. ¶ 16. Respondents oppose the request for a hearing. See Resp. Mem. at 46-47; Supp. Aff. ¶ 16; Supp. Decl. ¶ 15.

Rule 8(a) of the Rules Governing § 2254 Cases ("Rule 8") provides:

> If the petition is not dismissed at a previous stage in the proceeding, the judge, after the answer and the transcript and record of state court proceedings are filed, shall, upon a review of those proceedings and of the expanded record, if any, determine whether an evidentiary hearing is required. If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require.

Prior to the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), in 1996, "federal district courts enjoyed broad discretion in determining when to hold evidentiary hearings in habeas corpus proceedings." Ruine v. Walsh, 2005 WL 1668855, at *2 (S.D.N.Y. July 14, 2005) (citing Jones v. Vacco, 126 F.3d 408, 417 n.2 (2d Cir. 1997)); accord Pagan v. Keane, 984 F.2d 61, 64 (2d Cir. 1993) (noting that district courts had the "power to hold a hearing even though one was not required" and listing factors relevant to making this discretionary determination); see also Townsend v. Sain, 372 U.S. 293, 318 (1963) (stating that "[i]n every case" the district judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim"), overruled in part by, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992). In recent years, however, "the Supreme Court and Congress have severely limited the situations in which a habeas court is required or even permitted to hold an evidentiary hearing to consider factual claims by a habeas petitioner." Nieblas v. Smith, 204 F.3d 29, 31 (2d Cir. 1999) (citations omitted); accord Ruine, 2005 WL 1668855, at *2.

The relevant standard under the AEDPA for determining whether a habeas petitioner is entitled to an evidentiary hearing is prescribed by 28 U.S.C. § 2254(e)(2). Under § 2254(e)(2), a district court is prohibited from holding an evidentiary hearing where the petitioner "failed to

develop the factual basis of a claim in State Court proceedings" unless certain strict requirements are met. The Supreme Court has made clear, however, that "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams, 529 U.S. at 432. Because Savinon requested evidentiary hearings in both his September 2002 and September 2004 § 440.10 motions, see Sept. 2002 Notice of Motion; Sept. 2004 Notice of Motion, the Court will assume, arguendo, that Savinon showed the diligence required by the statute. Thus, the bar of § 2254(e)(2) is not at issue. See, e.g., Channer v. Brooks, 320 F.3d 188, 199 (2d Cir. 2003) ("where a petitioner has been diligent in developing his claim," the restrictions in § 2254(e)(2) on the ability to obtain an evidentiary hearing "simply do not apply").

That does not mean, however, that Savinon is "entitled to an evidentiary hearing -- only that he may be." McDonald v. Johnson, 139 F.3d 1056, 1060 (5th Cir. 1998); accord Fullwood v. Lee, 290 F.3d 663, 681 (4th Cir. 2002); accord Bowling v. Parker, 344 F.3d 487, 512 (6th Cir. 2003). In other words, "§ 2254(e)(2) specifies the situations where evidentiary hearings are allowed, not where they are required." McDonald, 139 F.3d at 1060 (emphasis in original); see also Ruine, 2005 WL 1668855, at *3 ("[A] petitioner whose claim is not precluded by 28 U.S.C. § 2254(e)(2) is not presumptively entitled to an evidentiary hearing.") (citing McDonald, 139 F.3d at 1060).

If a petitioner can clear the "initial hurdle" presented by § 2254(e)(2), "he must still persuade the district court" that he is entitled to an evidentiary hearing. McDonald, 139 F.3d at 1060. Where, as here, § 2254(e)(2) does not apply, "'it is . . . necessary to evaluate the request for an evidentiary hearing under pre-AEDPA standards.'" Davis v. Lambert, 388 F.3d 1052,

1061 (7th Cir. 2004) (citing cases); accord Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir.

1998) ("If . . . the applicant has not failed to develop the facts in state court, [we] may proceed to

consider whether a hearing is appropriate . . . or required under [pre-AEDPA standards].").

Under this standard, the decision whether to hold a hearing "is committed to the district court's

discretion pursuant to Rule 8." McDonald, 139 F.3d at 1060; accord Ruine, 2005 WL 1668855,

at *3 (the question of "whether that petitioner ought to be afforded an evidentiary hearing

remains an issue committed to the district court's sound discretion") (citing Nieblas, 204 F.3d at

32). Indeed, the court can "utilize any of the habeas rules designed to supplement the record

without the necessity of conducting a full-blown evidentiary hearing." Valverde v. Stinson, 224

F.3d 129, 135 (2d Cir. 2000)) (citations and internal quotation marks omitted); accord

Blackledge v. Allison, 431 U.S. 63, 81-82 (1977) (district courts "may employ a variety of

measures in an effort to avoid the need for an evidentiary hearing," including authorizing

discovery or permitting the parties to expand the record).

      Here, there is no need to hold an evidentiary hearing. Savinon has submitted an affidavit

from Camacho. The Court has requested and obtained an affidavit from Schulman. Savinon

outlines no additional areas of testimony that are needed for an evidentiary hearing. In any event,

he states that the "affidavits will . . . suffice" to adjudicate this habeas proceeding. See Ruggiero

Decl. ¶ 16 (citations omitted). Because the affidavits before this Court provide a sufficient basis

to adjudicate Savinon's petition, an evidentiary hearing is unnecessary. See, e.g., McDonald, 139

F.3d at 1060 (evidentiary hearing unnecessary where "the court had before it affidavits from the

two central parties -- [petitioner] and his trial counsel" and it was "uncertain what additional

evidence could have been introduced"); Richardson v. LeBlanc, 171 F. Supp. 2d 626, 629 (E.D.

La. 2001) ("Where . . . a district court has before it sufficient facts to make an informed decision regarding the merits of a claim, there is no abuse of discretion in refusing to grant an evidentiary hearing.  Such pertains even in a case where no factual findings were explicitly made by any state court.") (citing cases); see also Sawyer v. Hofbauer, 299 F.3d 605, 610-11 (6th Cir. 2002) (petitioner entitled to a hearing under § 2254(e)(2) only if he demonstrates, inter alia, that "relevant facts are in dispute") (citation and internal quotation marks omitted); Becton v. Barnett, 920 F.2d 1190, 1192 (4th Cir. 1990) (under pre-AEDPA standards court must hold evidentiary hearing where "material facts are in dispute"); Ruine, 2005 WL 1668855, at *5 ("Regardless of whether [petitioner's] request for an evidentiary hearing is evaluated under 28 U.S.C. § 2254(e)(2) or under the pre-AEDPA standards, . . . he has not established that a hearing is appropriate here as he has not established any material facts in dispute as to which trial counsel would testify.") (citing cases).

Conclusion

For the foregoing reasons, Savinon's petition should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to file any objections.  See also Fed. R. Civ. P. 6(a), (e).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Richard M. Berman, 40 Centre Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed

to Judge Berman. If a party fails to file timely objections, that party will not be permitted to raise

any objections to this Report and Recommendation on appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140

(1985).


Dated: October 12, 2005
      New York, New York


                                          _____
                                          GABRIEL W. GORENSTEIN
                                          United States Magistrate Judge

Copies sent to:

Lawrence F. Ruggiero
167 East 61st Street
New York, NY 10021

Kimberly Morgan
Assistant Attorney General
120 Broadway
New York, NY 10271

Honorable Richard M. Berman
United States District Judge

to Judge Berman.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985).

Dated: October 12, 2005
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Lawrence F. Ruggiero
167 East 61st Street
New York, NY 10021

Kimberly Morgan
Assistant Attorney General
120 Broadway
New York, NY 10271

Honorable Richard M. Berman
United States District Judge